15600

WADSWORTH v. McRAE DRUG COMPANY
(28 S. E. (2d), 417)

February, 1943.

*Mr. Samuel Want* and *Mr. Sam Rogol,* both of Darling-
ton, S. C., Counsel for Appellant,

*Mr. J. Arthur Knight,* of Chesterfield, S. C., and *Mr.
John D. Nock,* of Cheraw, S. C., Counsel for Respondent,

December 10, 1943.

CIRCUIT JUDGE L. D. LIDE, ACTING ASSOCIATE JUSTICE,
delivered the unanimous Opinion of the Court:

This is an appeal from a judgment entered on a verdict
in favor of the plaintiff against the defendant for the sum of
$2,000.00 (actual damages). The action was commenced
on or about February 4, 1939, and was tried before Hon.
G. B. Greene, presiding Judge, and a jury at the February,
1943, term of the Court of Common Pleas for Chesterfield
County.

The complaint alleges that the defendant, a South Carolina
corporation, engaged in the operation of a retail drug store
at Chesterfield, by reason of the action of its drug clerk in
putting drops of an alleged "injurious liquid" in plaintiff's
left eye, caused the total destruction of the sight thereof and

the impairment of the sight of his other eye. It is further alleged that the action complained of was negligent and willful, and the prayer of the complaint is for the sum of $50,000.00 damages. The amended answer of the defendant contains a general denial and certain special defenses.

During the course of the trial the Court overruled defendant's motion for a nonsuit at the close of plaintiff's testimony, and also overruled the defendant's motion for a directed verdict at the close of all the testimony, except that a verdict as to punitive damages was directed. (The demurrer of the defendant, raising similar questions, had been overruled just before the trial.) The case was submitted to the jury as to actual damages upon a charge by the Court to which no exception is made. And, as above stated, a verdict was rendered in favor of the plaintiff for the sum of $2,000.00.

The exceptions of the defendant are four in number, and according to the statement in the appellant's brief there are three questions presented as follows, each of which will be considered by us:

1. "Can a corporation be held liable for injuries resulting from medical services negligently performed by an unlicensed employee, under the circumstances disclosed in this case?"

(The phrase "unlicensed employee" evidently means that the drug clerk was not licensed to practice medicine, for it is admitted that he was a duly qualified pharmacist.)

2. "Should the trial Judge have granted defendant's motion for a direction of verdict on the ground that the testimony fails to show a causal connection between the acts of defendant's agent relied upon and the loss of sight sustained by the plaintiff?

3. "Did the trial Judge err in refusing to bring into the cause as defendants the surviving directors and liquidating trustees of the defendant corporation, upon a showing that

the charter of said corporation had been cancelled and the property of the corporation disposed of?"

Before discussing these questions it will be well for us to take at least a glance at the high lights of the evidence. And, as would be expected, the testimony is in some respects definitely conflicting.

The plaintiff testified in his own behalf that on the night of March 18, 1938, H. H. Hickman (a drug clerk employed by the defendant corporation as its manager, and incidentally an officer of the corporation) was in the place of business of the plaintiff in Chesterfield, he and Mr. Hickman being personal friends, and that Hickman told him: "You have got a case of sore eyes. Come to the store and I will give you something that will clear them up by in the morning." The plaintiff was in fact troubled with sore eyes, and he says that after a short time he went to the defendant's drug store, and referring to Hickman's conduct says: "And he prepared something or another and I paid him for it and he told me to come back and have a seat, and he took a medicine dropper and put it in my eye, and it was so painful when he put it in there until, he did not put it in my right eye, and he said, 'I have put the wrong medicine in your eye,' and he asked Dr. Teal what must he do, and Dr. Teal told him to put soda in my eye. That is what occurred right there."

Dr. Teal, who is referred to by the plaintiff, was the president of the defendant corporation and was himself a physician.

The plaintiff further testified that he spent a painful and sleepless night, and that in a short time he entirely lost the sight of his left eye in which the drops had been put, although he immediately consulted physicians, and that he continued to suffer great pain in that eye, and that his right eye had also been affected.

He further testified that some time after this occurrence he returned to the drug store and asked Mr. Hickman what

it was that he had put in his eye "that put my eye out," and that Hickman replied "that he put boric acid in my eyes." In this connection it should be stated that boric acid admittedly would not have injured plaintiff's eye.

In the excerpt from plaintiff's testimony above quoted he states that he paid for the medicine, and later in his testimony says that the amount paid was a dime, that being the charge made by Hickman "for the stuff he put in my eye."

One Arthur Davis, a person employed by the plaintiff in his filling station and grocery store, testified that he had a conversation with Mr. Hickman shortly after the occurrence in question, and that Hickman told him (quoting from the testimony) "that 'I made a slip-up on Mr. Wadsworth's eye.' I said, 'How,' and he said, 'I put the wrong medicine in his eyes.'" It appears that several doctors treated the plaintiff and that one of them testified in his behalf, and that three others were sworn in behalf of the defendant.

Mr. Hickman testified for the defendant at length in regard to the occurrence. He admits he told the plaintiff that if he would come to the store he would give him something that would "clear them up," referring to the plaintiff's eyes. And he says that when the plaintiff came into the store the following took place: "The only thing he said was he had come to get something for 'my eye,' and I told him to come back in the prescription room and asked him to sit down, I would put some drops in his eye to clear it up, and I reached up on the shelf and got this bottle that was labeled saturated solution of boric acid."

Mr. Hickman says that he allowed the drops to stay in plaintiff's eye about two minutes and then looked in the eye "and saw grayish pus in the corner of his eye," and that this was the reason why he asked Dr. Teal, who was in the store at the time, to look in the eye, and that Dr. Teal did so, and suggested that a saturated solution of soda should be used for the pus, and Hickman says that he also dropped some of that in plaintiff's eye. He further states that he made no

charge whatsoever, and that plaintiff did not pay him or offer to pay him anything. And Hickman denies the statement of plaintiff and his witness, Davis, to the effect that he admitted he had used the wrong medicine.

It also appears from the testimony of Mr. Hickman that the third day after the occurrence in question he poured down the sink the remainder of the liquid contained in the bottle which he says was labeled boric acid and from which he administered the drops in plaintiff's eye. We quote the following from his testimony:

"Q. Mr. Hickman, you continued to use this particular bottle of solution of boric acid? A. No, sir, I discarded it for fear I might cause somebody else some pain."

Some reference will hereinafter be made to the medical testimony.

The first question involved in this appeal is evidently based upon appellant's theory that what Hickman did amounted to the practice of medicine, and that therefore the defendant corporation could not be held liable; that such action on his part was beyond the scope of his employment, and as to the corporation was *ultra vires*. It is of course admitted that a corporation could not plead or rely on *ultra vires* in bar of liability if the act in question was authorized or ratified by it. And there was testimony here, although denied by the defendant, that it did receive the benefits accruing, even if the amount (ten cents) was very small.

It is quite true, as argued by counsel for the appellant, that a corporation may not engage in the practice of medicine even through licensed employees. *Ezell v. Ritholz,* 188 S. C., 39, 198 S. E., 419. And it is urged that on the ground of public policy the defendant corporation should not be held liable, since Hickman undertook the practice of medicine while employed by the defendant corporation "in some other capacity than that of a practitioner of medicine."

But we think it is indisputable that the evidence was amply sufficient to show that Hickman was acting in the scope of his employment, and we do not deem it necessary to consider any question of *ultra vires*. Indeed, we believe it is clear that there was no practice of medicine involved.

It so happens that the phrase "practice of medicine" or "practicing medicine" is carefully defined in Section 5150, Codes 1932 and 1942, which is as follows: .

"Any person shall be regarded as practicing medicine within the meaning of §§ 5149 through 5166 who shall as a business treat, operate on or prescribe for any physical ailment of another, or who shall engage in any branch or specialty of the healing art, or who shall diagnose, cure, relieve in any degree, or profess or attempt to diagnose, cure or relieve any human disease, ailment, defect, abnormality or complaint, whether of physical or mental origin, by attendance or by advice, or by prescribing or using or furnishing any drug, appliance, manipulation, adjustment, or method, or by any therapeutic agent whatsoever. But nothing in this article shall be construed to prohibit service in cases of emergency or the domestic administration of family remedies: provided, that nothing herein contained shall apply to those who practice the religious tenets of their church without pretending a knowledge of medicine or surgery, and provided that the laws, rules and regulations relating to contagious diseases and sanitary matters are not violated: provided, that nothing in §§ 5149 through 5166 shall be construed to prohibit licensed druggists from selling, using, and dispensing drugs in their places of business, respectively."

And it seems manifest that the transaction in question comes within the exception contained in the last proviso of the quoted section. In other words, what was done by Hickman is comprehended in the words "selling, using, and dispensing drugs in their places of business, respectively." The gravamen of plaintiff's complaint was that the defendant was

guilty of negligence in dispensing a harmful drug instead of a harmless or healing one. Certainly if the plaintiff had sought to purchase a solution of boric acid to be used in the treatment of his eyes, and the defendant's employee had delivered to him some injurious liquid through negligent mistake, the defendant corporation could not escape liability on the ground that this amounted to the practice of medicine, because obviously it would be merely the sale of a drug. Nor would the question be affected by the fact that the drug clerk or pharmacist had recommended the use of the harmless preparation sought to be bought.

There is no substantial distinction between the illustration just used and what actually occurred according to plaintiff's testimony. The mere fact that the drug clerk did the simple thing of putting the drops in plaintiff's eye in the drug store, instead of letting him take the medicine home and have some one else put the drops in his eye, can have no material effect. The statute was evidently intended to except from the concept of practicing medicine the selling, using and dispensing by druggists of drugs generally recognized as common or harmless remedies. And manifestly neither the plaintiff nor Hickman had in mind that Hickman was attempting to practice medicine. We think the trial Judge was clearly correct in declining to submit the issue of willfulness to the jury, for evidently there was no intention on the part of Hickman to injure the plaintiff in any way. On the other hand, if the jury believed (as they evidently did) that through negligence Hickman used the wrong medicine and that it was the proximate cause of plaintiff's injuries, their verdict was well justified.

We quote the following from 19 C. J., 780: "A person who is merely authorized to prepare, compound, and sell drugs and medicines does not have the right to practice medicine. But if one sells medicine, receiving payment therefor, and gives advice gratuitously as to the use to be made of

it, he is not holding himself out as a physician." See also 28 C. J. S., Druggists, § 6.

This brings us to the consideration of the second ■ question involved in this appeal as above stated, which relates to whether or not there was evidence to go to the jury on the matter of a causal connection between the acts of defendant's agent and the loss of sight sustained by the plaintiff.

We quote the following statement from the appellant's brief, which is a very fair summary of the testimony of the physicians:

"All of the medical testimony is to the effect that the condition of respondent's eye as described by him could be the result of a traumatic injury, or could be an infection resulting from disease or external causes.

"The foundation of a traumatic injury to the eye could have been the placing in the eye of certain strong acids, or an injury resulting from something getting in the eye, and the eye rubbed by the patient, injuring the cornea.

"The boric acid admittedly would not have injured the eye."

And counsel for appellant ably and earnestly argues that while there is testimony in behalf of plaintiff that his blindness in the left eye followed the insertion of the drops, the testimony of the medical witnesses leaves entirely to conjecture the answer to the question whether the injury was due to the drops placed in the eye or to some pre-existing cause involving either traumatic injury or disease. In other words, the argument is that since there was no testimony by any of the physicians that plaintiff's injuries actually resulted from the placing in his eye of any strong or deleterious acid, the testimony being solely to the effect that this might have been the cause, the jury could only conjecture thereabout.

We are of opinion, however, that the circumstances are quite sufficient to warrant the conclusion reached by the

jury. The evidence in behalf of the plaintiff, which should of course be considered most strongly in his favor, is that his blindness in the left eye promptly followed the insertion of the drops, as well as the acute and continuing pain; that while the defendant's agent claimed that he used a harmless drug, there was evidence that he admitted that he had used the wrong medicine, and that he himself testified that he destroyed the remainder of the contents of the bottle from which he took the drops, thus rendering it impossible to determine by scientific analysis precisely what was used; and the testimony of the physicians is to the effect that the injuries sustained by the plaintiff might have been due to the placing in his eye of certain strong acids.

In this connection, the testimony of Dr. R. M. Newsom, of Chesterfield, who was consulted by the plaintiff on March 19, 1938, the day after the drops were administered, but who testified in behalf of the defendant, is of interest and importance. In his testimony he reads from the written memorandum he had made relating to the examination. We quote:

" 'Found his eye every much irritated and cloudy, it seemed to have been subjected to some very strong medicine or infection, etc.' My diagnosis was 'interspacial paratitis,' with a cloudy condition following infection. On March 19th, according to my record, is the date of it, 1938. That is the day after it happened.

"Q. Have you taken a look at his eye since then? A. Yes.

"Q. Tell us how recently? A. Well, I have seen it every week, I guess, about two or three weeks.

"Q. What do you find there as to scar tissue? A. He has got a complete scar tissue over the cornea.

"Q. What do you find as to the loss of sight? A. I think the sight is completely gone."

The foregoing excerpt is taken from Dr. Newsom's cross examination, and we also quote the following from his redirect examination:

"Q. You said in here that you found his eyes very much irritated and cloudy and it seemed to have been subjected to some very strong medicine or infection? A. Yes.

"Q. You were not able to determine which of the two it was? A. No.

"Q. Whether it was medicine or infection? A. No.

"Q. And you are speaking of the day after the incident occurred? A. Yes."

Our conclusion is that the trial Judge committed no error in refusing to direct a verdict for the defendant as to actual damages.

The principles of law relating to the liability of druggists are really elementary and may be summed up in the phrase "due care" or "ordinary care," which is to be measured by the existing circumstances. It is said, by way of elaboration, in 17 Am. Jur., 856: "The legal measure of the duty of druggists towards their patrons, as in all other relations of life, is properly expressed by the phrase 'ordinary care,' yet it must not be forgotten that it is 'ordinary care' with reference to that special and peculiar business; in determining what degree of prudence, vigilance, and thoughtfulness will fill the requirements of 'ordinary care,' it is necessary to consider the poisonous character of many of the drugs with which the apothecary deals, and the grave and fatal consequence which may follow the want of due care. The care required has been held to be that high degree of caution and care called for by the peculiar and dangerous character of the business, that is, the highest degree of care and prudence for the safety of customers in the use of drugs and compounds known to practical men."

And we also quote the following from 19 C. J., 780: "The law imposes upon a druggist the duty so to conduct his business as to avoid acts in their nature dangerous to the lives of others, and one who is negligent in the performance of such duty is liable for damages to any person injured thereby. Where a druggist's clerk, in the course of his employ-

ment, negligently supplies a harmful drug in lieu of a harmless one called for, either by prescription or otherwise, and injury results from taking it, the druggist will be liable in damages." See, also, 28 C. J. S., Druggists, § 6.

In the case of *Sandel v. State,* 115 S. C., 168, 104 S. E., 567, 13 A. L. R., 1268, an action against the State for death of children from inoculation with impure vaccine furnished by the State Board of Health, this Court held that the law requires the exercise of due care, that is to say, such care as a person of ordinary reason and prudence would exercise in the circumstances, and that the degree of knowledge, skill and care required of a pharmacist or a manufacturing chemist is that which is ordinarily possessed and exercised by those in their special line of work.

The third question presented by this appeal relates to an order dated April 20, 1942, signed by Hon. Henry Busbee, Special Judge, then presiding at Chesterfield, wherein he denied the defendant's motion to add as parties defendant the surviving directors of the defendant corporation. This motion was based upon an affidavit signed by one D. T. Teal to the effect that at the time of the dissolution of the McRae Drug Company all of its assets had been sold in foreclosure proceedings under the terms of chattel mortgages covering its property, and that at the time of the dissolution there were no assets to pass into the hands of the directors and liquidating trustees, except book accounts subsequently sold for $100.00; and the names of the directors and liquidating trustees are given, one of them having died. The notice of motion also stated that the McRae Drug Company was dissolved and its certificate of incorporation cancelled on or about April 25, 1940, this being more than a year after the commencement of the instant action.

We are of opinion, however, that the directors and liquidating trustees were not necessary parties to this action. It

is expressly provided in Section 7715, Codes 1932 and 1942, that an action begun against a corporation "which may become dissolved before final judgment shall not abate by reason thereof, but no judgment shall be entered therein except upon notice to the trustees or receivers of the corporation." This section fully protects the liquidating trustees of any dissolved corporation, and is sufficient in itself to show that they have no legal interest in a pending suit until judgment has been rendered and is ready for entry therein. Indeed, it is provided in Section 7709, Codes 1932 and 1942, that all corporations however dissolved "shall be continued bodies corporate for the purpose of prosecuting and defending suits by or against them and of enabling them to settle and close their affairs, to dispose of and convey their property and to divide their capital, but not for the purpose of continuing the business for which they were established."

We are likewise of opinion that the position of the appellant that under Section 409 (Codes 1932 and 1942) the surviving directors and liquidating trustees should be brought in, on the ground that a complete determination of the controversy cannot be had without their presence, is untenable, because the only controversy involved in this action is the one existing at the time the action was commenced, to wit, whether or not the defendant corporation is liable to the plaintiff for damages resulting from its alleged negligence, and that the liquidating trustees have no more legal interest in such controversy than the officers and directors of the corporation had at the commencement of the action.

All the exceptions are overruled and the judgment affirmed.

Affirmed.

MESSRS. ASSOCIATE JUSTICES BAKER, FISHBURNE, and STUKES, and CIRCUIT JUDGE WM. H. GRIMBALL, ACTING ASSOCIATE JUSTICE, concur.