23972

John McMILLAN and Charlene McMillan, as Guardians ad Litem for Joseph Shea McMillan, a minor, Respondents v. James DURANT, M.D., William F. Young, M.D., Sumter Pediatrics, P.A., and The Tuomey Hospital, of whom The Tuomey Hospital is Appellant. Appeal of The TUOMEY HOSPITAL.

(439 S.E. (2d) 829)

Supreme Court

*Harold W. Jacobs* and *Julian Henning, III*, of *Nexsen, Pruet, Jacobs & Pollard,* Columbia, and *George C. James, Jr.* of *Richardson, James & Player,* Sumter, *for appellant.*

*Michael Parham,* of *Parham and Smith,* Greenville, *for respondent.*

Heard Nov. 17, 1993.

Decided Dec. 20, 1993.

TOAL, Justice:

This is an appeal from a jury verdict for medical malpractice rendered against the Tuomey Regional Medical Center. we AFFIRM.

## FACTS

Prematurely born on February 21, 1985, Joseph McMillan suffered intercranial bleeding which required the insertion of a shunt[1] to relieve pressure and prevent brain damage. Over time, Joseph required three more shut revisions by a neurosurgeon. On Friday, August 15, 1986, Joseph became ill while returning from a family vacation. Three days later, Joseph's family took him to see his pediatrician for treatment.

After an examination, the pediatrician diagnosed Joseph as suffering from an ear infection, upper respiratory tract infection, and a slight runny nose. He also found that the shunt was operating properly. By August 22, 1986, Joseph's condition had deteriorated. The shunt was tested and its malfunction ruled out as a cause of Joseph's illness. This time the pediatrician diagnosed Joseph as suffering from an inflammation of the stomach intestines. As a precaution for Joseph's dehydration, the pediatrician decided that Joseph should be admitted to Tuomey Hospital for intravenous hydration.

---

[1] A shunt is a drain inserted into the brain, with a tube running to the abdominal cavity. The shunt allows excess fluid around the brain to drain into the abdominal cavity which prevents excess pressure on the brain. This excess pressure on the brain results in brain damage and the shunt is an aggressive measure to minimize the effect of the fluid pressure.

There is evidence that the hospital did not become aware of Joseph's shunt when he was admitted at 1:40 p.m.; instead, that evening at approximately 8:00 p.m., a nurse discovered the shunt and informed her nursing supervisor. The nursing supervisor checked the shunt and determined that it was operating properly. The on-call physician, while making rounds, examined Joseph and determined that the shunt was operating properly.

Later the same evening, at approximately 10:55 p.m., a nurse checked Joseph's I.V. while he was in his mother's arms. The mother was seated in a semi-dark room watching television and the child was sleeping. The mother mentioned to the nurse that Joseph was not acting normally because he would open and close his mouth as he breathed. The nurse observed Joseph for several minutes and later testified that the child's color was good, respiration was normal, and the child appeared to be resting comfortably. The nurse also noted that Joseph did open and close his mouth when he breathed. After assuring the mother that there was little to worry about, the nurse stated that she would check around with the other nurses.

The nurse discussed her observation with the other nurses and her supervisor during the shift change; however, she made no attempt to contact the admitting or on-call physician. At approximately 11:02 p.m., the nursing supervisor went to Joseph's room and, without increasing the light level, noted that Joseph was resting comfortably. She later testified that she did see Joseph opening and closing his mouth to facilitate breathing. She determined that Joseph was acting normally and left the room. A minute to two minutes later, Joseph stopped breathing.

The mother notified the floor nurse and efforts to resuscitate Joseph began immediately. At 11:15 p.m., Dr. Young, the attending physician, was notified that Joseph was not breathing. At 11:30 p.m., Dr. Young arrived and finally, well into the resuscitative efforts, contacted the neurosurgeon. After a consultation, the neurosurgeon advised Dr. Young to tap the shunt and, if excess pressure was found, to drain of the excess fluid. Joseph's shunt was drained twice before the pressure was reduced to a safe level. At 1:30 a.m., Joseph was transferred to Columbia and placed in the neurosurgeon's care.

There it was discovered that the abdominal end of the shunt was blocked and the elevated pressure on Joseph's brain caused him to stop breathing. The unfortunate result for Joseph was that he suffered severe, permanent brain damage.

A complaint was filed on February 21, 1991 against Dr. Durant, Dr. Young, Sumter Pediatrics, P.A., and Tuomey Regional Medical Center, Inc., a charitable hospital, alleging negligent failure to promptly and properly treat Joseph while he was a patient at Tuomey. Dr. Durant, Dr. Young, and Sumter Pediatrics, P.A. all settled right before trial leaving Tuomey as the only party left in the action. At trial, a verdict was returned against Tuomey in the amount of $734,100.00, and the trial judge imposed the statutory cap of $200,000. Tuomey now appeals.

## ISSUES

Tuomey raises two issues on appeal:

1. Is it proper to allow a physician expert witness to provide expert opinions as to the appropriate nursing standard of care and whether the pediatric nurses failed to conform to the required standard?

2. Did the trial court err in refusing to charge the locality rule as the appropriate standard of care in South Carolina for the negligence of a hospital's nursing staff?[2]

## LAW/ANALYSIS

### Expert Testimony on Nursing
### Standard of Care

Tuomey first contends that the physician expert witness, offered by the McMillans, should not have been allowed to testify as to the appropriate standard of nursing care and whether the nursing staff failed to comport with the appropriate standard.

Recently, addressing the issue of the admissibility of an expert witness' testimony in the criminal context, we reiterated the long-established rule that the qualification of a witness as

[2] A hospital as an entity cannot practice medicine, diagnose an illness, or establish a course of treatment; however, the hospital may be held vicariously liable for the negligence of its employees. 41 C.J.S., Hospitals § 21 (1991).

an expert falls largely within the trial judge's discretion. *State v. Schumpert,* — S.C. —, 435 S.E. (2d) 859 (1993) (Davis Adv. Sh. No. 22 at 34) (wherein the State offered a witness on the topic of sexual abuse to establish the existence of Rape Trauma Syndrome). In *Schumpert* we stated:

> [t]he party offering the expert has the burden of showing his witness possesses the necessary learning, skill, or practical experience to enable the witness to give opinion testimony. Generally, however, defects in the amount and quality of education or experience go to the weight of the expert's testimony and not its admissibility.

*Id.* at 36.

The discretionary authority of the trial judge is the same in the civil context. The qualification of an expert witness and the admissibility of the expert's testimony are each matters largely within the trial judge's discretion. *Creed v. City of Columbia,* — S.C.—, 426 S.E. (2d) 785 (1993). In *Creed,* a general practitioner was allowed to testify as an expert witness on the mental and emotional damages suffered by a tort victim, even where the city objected to the evidence because the expert was not a neurologist or psychologist. We held that:

> a physician is not incompetent to testify merely because he is not a specialist in the particular branch of his profession involved. . . . The fact that he is not a specialist goes to the weight of his testimony, not its admissibility.

*Id.* at —, 426 S.E. (2d) at 786.

In *Botehlo v. Bycura,* 282 S.C. 578, 320 S.E. (2d) 59 (Ct. App. 1984), the Court of Appeals affirmed a grant of summary judgment against the plaintiff where the plaintiff submitted expert testimony of an orthopedist as to the standard of care to be followed by a podiatrist. The court held that the fact a witness is an expert in his own field does not make him an expert in another field. This was especially true where the record established that the orthopedist was not versed at all in the practice of podiatry. In *Botehlo,* the orthopedic expert's lack of knowledge in the area of podiatry was fatal to the admissibility of his testimony.

■ On the present facts, however, the trial judge did not abuse his discretion in the admission of the expert's testimony. The expert physician was thoroughly examined as to his credentials and background, which included his professional interaction with a multitude of various nursing staffs and his teaching nursing courses at the University of Pittsburgh and the Yale University School of Medicine. Tuomey based its objection to the physician's qualification as an expert on nursing on the contention that a neurosurgeon was not qualified to testify about the appropriate standard of nursing care. The fact that the expert was a physician and not a nurse would merely go to the weight of his testimony, not to its admissibility. As a teacher in the field of nursing, the neurosurgeon here, unlike the orthopedist in *Botehlo*, was amply qualified to render an opinion in the field of nursing. In light of our holding in *Creed*, there is no evidence in the record that the trial judge abused his discretion.

Locality Standard For Hospitals and Nurses

■ Tuomey next argues that the trial court erred in not charging the "locality rule" to define the appropriate standard of nursing care in a medical malpractice action. Tuomey contends that, although in *King v. Williams*, 276 S.C. 478, 279 S.E. (2d) 618 (1981), this Court adopted a national standard of care for physicians and dentists in South Carolina, there is no South Carolina precedent that abandons the locality standard of care for hospitals and nurses.

Tuomey's justification for maintaining the locality standard for nurses and hospitals is premised on the arguments similar to those originally advanced for maintaining a local standard for physicians. The old concerns for regional limits on training and lack of exposure to multi-regional practice for physicians is equally outdated for nurses. Tuomey also argues that nurses in an "elite medical center" will be exposed to different methods and procedures than nurses in local general hospitals. There is also the argument that nurses have a wide variety of classifications based on education.

While all of these arguments may be applicable to nurses, each argument can be applied equally to any health care professional. For example, physicians have different specialties and associated education levels. Physicians also work in varying medical environments that range from the small rural clinic

to the large urban medical center. Under a national standard, the appropriate comparative analysis must consider the physician by specialty, educational level, Medical environment, and any factor which is relevant to sound medical practice. In its simplest form, this means that a general practitioner in a small rural hospital in South Carolina will be held to the same standard as a general practitioner in a small rural hospital in Iowa.

These policy arguments aside, the evolution of the law appears to support the adoption of a national standard of care throughout the health care system. Several states have extended their appropriate standard of care for physicians to other health care professionals, including nurses. In *Durflinger v. Artiles*, 234 Kan. 484, 673 P. (2d) 86 (1983), the Kansas Supreme Court held that the "[r]ules of law governing the duty of physicians and surgeons to their patients apply generally to dentists, and to registered nurses." *Id.*, 673 P. (2d) at 92; *see Belmon v. St. Frances Cabrine Hosp.*, 427 So. (2d) 541 (La. App. 3 1983) (wherein Louisiana follows an identical rule and an identical standard of care).[3]

The Colorado Court of Appeals held that since the practice of nursing "is a highly regulated profession in this state, . . . the applicable standard of care is that of the reasonable professional. . . . This minimum standard is not affected by standards which may be adapted by various hospitals." *Wood v. Rowland,* 41 Colo. App. 498, 592 P. (2d) 1332 (1978). New York has also acknowledged that a nurse is a health care professional subject to the same duties as a physician in the exercise of due care. *Gould v. New York City Health and Hospitals*, 128 Misc. (2d) 328, 490 N.Y. S. (2d) 87 (Supp. 1985).[4]

Similarly, California has extended the health care professional standard of care to include nurses without regard to a locality rule. *Fraijo v. Hartland Hospital*, 160 Cal. Rptr. 246, 99 Cal. App. (3d) 331 (1979); *see also* 70 C.J.S., Physicians and Surgeons, § 64 (1987). While acknowledging the difference in education and experience among the various classifications of

---

[3] Kansas and Louisiana, at the time of the *Durflinger* decision, still had the locality or community standard of care for physicians, dentists, and registered nurses.

[4] Colorado and New York have extended the "reasonable professional" standard to include nurses. This extension in the standard of care to be exercised by a medical professional does not include a locality restriction.

nurses, the court reasoned that, "[w]hile traditionally [nurses] have followed the instructions of attendant physicians, doctors realistically have long relied on nurses to exercise independent judgment in many situations." *Id.* at 252, 99 Cal. App. (3d) at 342.

In South Carolina, we rejected the locality rule for physicians and dentists in the landmark decision of *King v. Williams, supra.* In *King*, we noted several reasons for the abolition of the locality rule which are equally applicable to the nursing profession. The first was the scarcity of local physicians who would be willing to testify against a peer. *Id.* While perhaps not as closed a community, present-day nursing professionals may also have a certain reluctance to testify against a local peer. The second reason was that the locality rule allowed for a local standard of care below what a patient was entitled to expect. *Id.* This reasoning is equally applicable to the nursing profession of today.

In formulating the standard of care in *King*, we adopted language directly from a Washington case, *Pederson v. Dumouchel*, 72 Wash. (2d) 73, 431 P. (2d) 973 (1967), which dealt with the standard of care for physicians and dentists. The omission of nurses or other health care providers should not hold some special meaning. Regardless of the geographic limit on the type of standard, many courts have recognized that nurses are health care professionals who should be subjected to the same standards as other health care providers. In South Carolina, we have adopted a "national" rather than a "local" standard of care. Following the current rule adopted in many other jurisdictions, a South Carolina nurse should be held to the same standard of care as any other South Carolina health care professional.

Accordingly, we extend the holding of *King* to include nursing professionals and other health care professionals.[5] Therefore, we find no error in the admission of the expert testimony or the rejection of the locality rule, and AFFIRM the trial court.

HARWELL, C.J., and CHANDLER, FINNEY and MOORE, JJ., concur.

---

[5] Other professionals, for example, would included chiropractors, lab technicians, and physical therapists who, under Tuomey's analysis, could still argue that a locality rule would be applicable.