511 S.E.2d 69

**Dr. David R. BAIRD, Dr. George D. Grice, Dr. Michael Lampkin, and Dr. Jay B. Robards, Appellants,**

v.

**CHARLESTON COUNTY, South Carolina, Respondent.**

No. 24885.

Supreme Court of South Carolina.

Heard Oct. 7, 1998.

Decided Jan. 18, 1999.

Rehearing Denied Feb. 25, 1999.

Carl F. Muller, John C. Moylan, III, and Andrew B. Coburn, of Wyche, Burgess, Freeman, & Parham, P.A., of Greenville, for appellants.

Robert L. Widener and Michael A. Scardato, of the McNair Law Firm, of Columbia, for respondent.

TOAL, Justice:

This case involves the issuance of tax exempt bonds by Charleston County ("County") for the purchase and renovation of a medical care facility. A group of Charleston doctors ("Doctors") sued to enjoin the issuance of the bonds. The circuit court granted County's motion to dismiss and also granted summary judgment on several issues. We affirm in part and reverse in part.

### FACTUAL/PROCEDURAL BACKGROUND

The Medical University of South Carolina ("MUSC") had plans to build an out-patient clinical practice facility on its campus. As plans for the new facility were being developed, an opportunity to purchase the St. Francis Hospital facility adjacent to the MUSC campus became available. MUSC determined that the St. Francis facility could be utilized to house its clinical practice programs. University Medical Associates ("UMA")[1] of MUSC chose to pursue tax-exempt bonds under the Hospital Revenue Bond Act, S.C.Code Ann. § 44–7–1410 *et seq.* (1976 & Supp.1997) (the "Act"), to fund the purchase price and renovation cost for the St. Francis facility.

Charleston County Council approved a bond ordinance on December 31, 1996, issuing $85 million in tax-exempt hospital revenue bonds for the purchase and renovation of St. Francis Hospital. County Council approved the bonds after a third

---

1. UMA is described as a not-for-profit corporation that functions as the billing and collection agent for the clinical services by MUSC faculty members.

reading of the ordinance. The bonds will be the limited obligation of Charleston County payable from the revenues of UMA's clinical practice program. It is estimated that if such hospital bonds are not issued, MUSC could pay over $25 million more in interest costs over the life of the loan to acquire the facility and over $12 million for the renovation costs of the facility. On April 8, 1997 the State Budget and Control Board, by a vote of 5 to 0, approved the issuance of the bonds.[2]

On June 7, 1997, Doctors sued to enjoin the issuance of the hospital revenue bonds.[3] The defendant, County, made a Rule 12(b) motion to have Doctors' complaint dismissed.[4] The trial court granted County's motion, making the following conclusions: (1) Doctors lacked standing to sue; (2) pursuant to the "Enrolled Bill Rule," Doctors could not go behind the collective action of the county council; (3) there was no allegation or proof of any alleged conflict on the part of those voting to pass the Ordinance after the third reading; (4) the trial court did not have jurisdiction to review the conflict of interest claim; (5) the record did not substantiate a conflict of interest on the part of Dr. Wallace; (6) UMA is a "hospital agency" that may participate in the issuance of tax-exempt hospital revenue bonds; (7) nothing substantiates that UMA is engaged in the unlawful practice of clinical medicine and, additionally, the proper defendant for such a claim is UMA, not County; and (8) Doctors failed to fulfill the statutory conditions precedent to filing the lawsuit.

Doctors appealed, raising the following issues:

---

2. To comply with S.C.Code Ann. § 44–7–1590(B) (Supp.1997), the Budget and Control Board published its decision in the Charleston *Post and Courier* on May 22, 1997.

3. The complaint alleged the following causes of action: (1) Dr. Charles Wallace, an elected member of the Charleston County Council and employee of UMA, had a direct conflict of interest in voting on the proposed hospital revenue bonds; (2) hospital revenue bonds may be issued only for the benefit of either a "hospital agency" or a "public agency," and UMA is neither; and (3) UMA is a corporation engaged in the unlawful practice of medicine and therefore, issuance of the proposed bonds would aid and abet UMA in that unlawful activity.

4. Alternatively, the defendants moved to have the plaintiffs post a bond of not less that $1,700,000.00.

(1) Whether physicians who directly compete with the proposed beneficiaries of a hospital revenue bond have standing to challenge the issuance of those bonds?

(2) Whether the issuance of bonds should be invalidated because of Dr. Wallace's participation on county council?

(3) Whether UMA may be considered a "hospital agency" or a "public agency" such that it may receive tax-exempt bonds pursuant to the Hospital Revenue Act?

(4) Whether UMA is engaged in the unlawful practice of medicine and, if so, whether that prevents UMA from receiving the tax-exempt bonds?

(5) Whether Doctors were required to comply with the procedure set forth in S.C.Code Ann. § 15–77–20 (1976) in filing this lawsuit?

(6) Whether summary judgment was proper under the facts of this case?

## LAW/ANALYSIS

### A. CONVERSION OF 12(b)(6) MOTIONS

There has been much confusion in this case over whether the trial court properly granted summary judgment on several of the issues. County's original motion before the trial court was a motion to dismiss made pursuant to Rule 12(b), SCRCP, and included, among others, the following arguments: (1) Doctors failed to comply with the procedure in S.C.Code Ann. § 15–77–20 (1976) in instituting this action; (2) Doctors lacked standing; (3) the trial court did not have subject matter jurisdiction over the conflict of interest claim; (4) Doctors failed to state a cause of action concerning the third reading of the Bond Ordinance; and (5) the trial court lacked subject matter jurisdiction and/or Doctors failed to state a cause of action as to whether UMA was a "hospital agency" or "public agency" and whether UMA was authorized to practice medicine. At the motion hearing, Doctors' attorney reminded the trial court that this was a hearing to consider County's motion to dismiss and complained about affidavits submitted by County in support of its motion. The trial court nevertheless granted summary judgment on several of the issues.

Under Rule 12(b)(6), SCRCP, a defendant may make a motion to dismiss based on a failure to state facts sufficient to constitute a cause of action. Generally, in considering a 12(b)(6) motion, the trial court must base its ruling solely upon allegations set forth on the face of the complaint. *Stiles v. Onorato,* 318 S.C. 297, 457 S.E.2d 601 (1995). The 12(b)(6) motion may not be sustained if the facts alleged and inferences therefrom would entitle the plaintiff to any relief on any theory. *Id.* Rule 12(b) further provides:

> *If,* on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state facts sufficient to constitute a cause of action, *matters outside the pleading are presented* to and not excluded by the Court, *the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.*

Rule 12(b), SCRCP (emphasis added). We have interpreted this language as meaning "the trial court may treat a 12(b)(6) motion as a motion for summary judgment and consider matters presented outside the pleadings if the parties are afforded a reasonable opportunity to respond to such matters in accordance with Rule 56(c) and (e) of the South Carolina Rules of Civil Procedure. The notice provisions in Rule 56 are incorporated into Rule 12(b)(6)." *Brown v. Leverette,* 291 S.C. 364, 367, 353 S.E.2d 697, 698–99 (1987); *see also Johnson v. Dailey,* 318 S.C. 318, 457 S.E.2d 613 (1995). In *Brown,* we found the trial court had not given notice to the parties that it was going to consider the affidavits and hear the 12(b)(6) motion as a motion for summary judgment. Thus, the supporting affidavits in *Brown* were improperly considered by the trial court in ruling on the 12(b)(6) motion.

In the instant case, the trial court bifurcated County's jurisdictional motions and its 12(b)(6) motions. For the jurisdictional motions, the trial court ruled that it would address them as a matter of law on the facts before it. For the 12(b)(6) motions, the trial court ruled that it must convert them to motions for summary judgment since matters outside the pleadings were submitted by both parties and not excluded by it at the hearing. We find that the trial court improper-

ly converted County's 12(b)(6) motions into summary judgment motions.

County submitted its motion to dismiss to the trial court on June 30, 1997. On September 23, 1997, just two days before the motion hearing, County filed its memorandum in support of its motion to dismiss along with supporting affidavits. At the hearing, County never argued that its affidavits and other documents were in support of its 12(b)(6) motions. In fact, County's attorney unequivocally stated at the hearing that the affidavits were being introduced in support of County's jurisdictional motion: "I have filed several affidavits in this in support of my jurisdictional motion because this gives you the background of what is at stake here and what University Medical Associates is;" "I presented affidavits that deal with the jurisdictional issues in this case." [5] Moreover, the trial court did not give notice to the parties prior to the hearing that it was going to consider affidavits and hear the 12(b)(6) motions as motions for summary judgment.[6] The first indication that County's 12(b)(6) motions would be converted to summary judgment motions was the trial court's order of dismissal. Under these facts, the trial court erred in converting County's 12(b)(6) motions into motions for summary judgment. See *Brown v. Leverette*, 291 S.C. 364, 353 S.E.2d 697; *Higgins v. MUSC*, 326 S.C. 592, 486 S.E.2d 269 (Ct.App.1997) (holding that the plaintiffs had not been "fairly apprised" that the trial court would consider material outside the pleadings in support of the defendant's 12(b)(6) motion).

---

5. At the motion hearing, Doctors' attorney objected to the introduction of County's affidavits, arguing that the hearing was on a motion to dismiss and not on the merits of the case. County's attorney responded, stating that the affidavits were in support of County's jurisdictional motions.

6. Providing notice prior to the hearing is essential under Rule 56(c): "The [summary judgment] motion shall be served at least ten days before the time fixed for the hearing. The adverse party may serve opposing affidavits not later than two days before the hearing...." Rule 56(c), SCRCP. In fact, County's proposed order dated October 10, 1997, provides for express notice of the 12(b)(6) conversion 30 days before a hearing. However, there is no evidence in this case suggesting Doctors had any notice prior to the hearing, in compliance with Rule 56, SCRCP, that the trial court would look beyond the pleadings in considering County's 12(b)(6) motions.

▆▆▆▆ Nevertheless, affidavits and other evidence outside the pleadings may, in certain circumstances, be considered in support of a motion to dismiss based on lack of jurisdiction. For instance, when the allegations of the complaint are factually sufficient under Rule 8(a)(1), SCRCP, but do not affirmatively show subject matter jurisdiction, the motion to dismiss may be supported by, and the court may consider, affidavits or other evidence proving lack of jurisdiction. *Woodard v. Westvaco Corp.*, 315 S.C. 329, 433 S.E.2d 890 (Ct.App.1993), *vacated on other grounds by* 319 S.C. 240, 460 S.E.2d 392 (1995). However, the presentation of such evidence does not convert the motion to dismiss into one for summary judgment. Summary judgment is an adjudication on the merits of the case, whereas dismissal for lack of subject matter jurisdiction is not an adjudication on the merits. *Id.*

▆▆▆▆ Thus, we find the trial court erred in converting County's 12(b)(6) motions to summary judgment motions. That said, even if the motions were properly converted to summary judgment motions, summary judgment should not have been granted. Summary judgment is appropriate when it is clear that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. *Cafe Assoc., Ltd. v. Gerngross*, 305 S.C. 6, 406 S.E.2d 162 (1991). In ruling on a motion for summary judgment, the evidence and the inferences which can be drawn therefrom should be viewed in the light most favorable to the non-moving party. *Id.* In general, if the pleadings and evidentiary matter in support of summary judgment do not establish the absence of a genuine issue of material fact, summary judgment must be denied, even if no opposing evidentiary matter is presented. *See Title Ins. Co. of Minnesota v. Christian*, 267 S.C. 71, 226 S.E.2d 240 (1976); Rule 56(c), SCRCP. Moreover, summary judgment must not be granted until the opposing party has had a full and fair opportunity to complete discovery. *Baughman v. AT & T*, 306 S.C. 101, 410 S.E.2d 537 (1991). In the present case, nothing in the record before this Court demonstrates the absence of a genuine issue of material fact on any of the issues. In addition, the parties have yet to engage in discovery. Nevertheless, summary judgment may be appropriate at some later stage in the proceedings if evidence is presented in compliance with Rule 56, SCRCP,

that demonstrates the absence of a genuine issue of material fact.

To avoid any further confusion as this case proceeds below, we will consider each issue ruled upon by the trial court.

## B. STANDING

Doctors argue they are "interested parties" under the Act and, therefore, have standing to bring this lawsuit.

S.C.Code Ann. § 44–7–1590(C) (Supp.1997) provides:

Any *interested party*, within twenty days after the date of the publication of the notice, but not afterwards, may challenge the action so taken by the state board, the county board, or the Department of Health and Environmental Control, by action de novo in the court of common pleas in any county where the hospital facilities are to be located.

(emphasis added).

Although section 44–7–1590(C) does not define "interested party," to have standing, one must generally have a personal stake in the subject matter of the lawsuit, *i.e.*, one must be a *real party in interest*.[7] *Glaze v. Grooms*, 324 S.C. 249, 478 S.E.2d 841 (1996); *Townsend v. Townsend*, 323 S.C. 309, 474 S.E.2d 424 (1996). A real party in interest is one with a real, material, or substantial interest. *Anchor Point Inc. v. Shoals Sewer Co.*, 308 S.C. 422, 418 S.E.2d 546 (1992).

Additionally, a private person may not invoke the judicial power to determine the validity of executive or legislative action unless he has sustained, or is in immediate danger of sustaining, prejudice therefrom. *Blandon v. Coleman*, 285 S.C. 472, 330 S.E.2d 298 (1985); *see also Myers v. Patterson*, 315 S.C. 248, 433 S.E.2d 841 (1993). Such imminent prejudice must be of a personal nature to the party laying claim to standing and not merely of general interest common to all members of the public. *Citizens of Lee County, Inc. v. Lee County*, 308 S.C. 23, 416 S.E.2d 641 (1992).

---

7. The right of a plaintiff to maintain a suit, while frequently treated as going to the question of jurisdiction, goes, in reality, to the right of the plaintiff to relief rather than the jurisdiction of the court to afford it. *Bardoon Properties, NV v. Eidolon Corp.*, 326 S.C. 166, 485 S.E.2d 371 (1997).

However, a court may confer standing upon a party when an issue is of such public importance as to require its resolution for future guidance. *See Thompson v. South Carolina Comm'n on Alcohol and Drug Abuse,* 267 S.C. 463, 229 S.E.2d 718 (1976) (holding that the plaintiffs had standing because the questions involved were of such wide concern, both to law enforcement personnel and to the public); *Berry v. Zahler,* 220 S.C. 86, 66 S.E.2d 459 (1951) (holding that questions of public interest originally encompassed in an action should be decided for future guidance); *Ashmore v. Greater Greenville Sewer Dist.,* 211 S.C. 77, 44 S.E.2d 88 (1947) (same); *cf. Quinn v. City of Columbia,* 303 S.C. 405, 401 S.E.2d 165 (1991) (rejecting the contention that the matter was of such public importance as to confer standing).

In this case, Doctors have specifically alleged that County committed an *ultra vires* act by exceeding its statutory authority to issue the hospital bonds. Moreover, the issuance of the hospital bonds clearly impacts a profound public interest—the public health and welfare. In fact, the express purpose of the Act is to promote the public health and welfare. *See* S.C.Code Ann. § 44–7–1420 (1985). It is hard to conceive of any greater societal interest than this one. Thus, as citizens of Charleston County, Doctors have a significant interest in ensuring that their county acts within the legal parameters established by the legislature for funding hospital development. Thus, by virtue of the immense public interest at stake here, Doctors have standing to bring the present action, and any further determination of imminent prejudice is unnecessary.

## C. STATUTORY CONDITIONS PRECEDENT

The court below found that Doctors had not complied with the requirements of S.C.Code Ann. § 15–77–20 (1976) in filing their lawsuit. Thus, the court held that the present action was barred. Doctors argue section 15–77–20 is inapplicable to the instant facts and section 44–7–1590(C) provides the only procedure with which they must comply. We agree.

Section 15–77–20 provides in full:

§ 15–77–20. SUITS AFFECTING OBLIGATIONS OF THE STATE

*No suit shall be filed nor shall any pending suit be prosecuted in any court of this State affecting the issuance or sale of any state security, certificate of indebtedness or bond* the intent or effect of which is to prevent, delay or affect the sale or other disposition thereof or which would have this effect unless and until the plaintiff in such action shall make application to the circuit judge presiding in the circuit in which the action is brought or, if there be no judge presiding, then to the resident judge of such circuit or to the Chief Justice of the Supreme Court, if the action be brought in the original jurisdiction thereof, or if he be disabled or disqualified to an associate justice, for leave to bring or prosecute such action and shall convince such judge or justice of the merit in such action or proceeding. Such suit shall not then be filed or prosecuted unless and until the plaintiff shall file in such court a bond in such amount as will adequately protect the State against loss, damage, injury and costs in an amount of not less than twenty-five thousand dollars, subscribed by a duly licensed surety company or secured by the deposit of a like amount in cash, conditioned to pay all loss, damage, injury and costs, including attorney's fees, which the State may sustain in any such action. And before any such action shall be commenced at least ten days' notice thereof, together with a copy of the proposed complaint, shall be given to the Governor and the State Treasurer, so as to afford them an opportunity to appear before the judge or justice in opposition to the filing of the suit and to be heard upon the amount of the bond to be required.

(emphasis added).

The bond ordinance in this case describes the relevant hospital bonds as being issued by County for the purpose of defraying the cost of acquiring St. Francis Hospital. The Budget and Control Board Resolution also states that "the Bond proceeds are to made available to [UMA] upon terms which require [UMA] to make payments to or for the account of the County in amounts sufficient to pay the principal of, premium, if any, and interest on the Bonds...." The ordinance declares that the bonds and the interest shall never constitute an indebtedness of County.

 The critical question here is whether the issuance of these hospital revenue bonds by County constitutes the issuance of *state* bonds or securities as contemplated by section 15–77–20. We find they do not.

 Our Constitution and Code of Laws clearly differentiate between county and state bonds. In the Code, county bonds are covered under S.C.Code Ann. § 4–15–10 *et seq.* (1986). Section 15–77–20, on the other hand, governs "suits affecting the obligations of the state." Additionally, pursuant to Article X, § 11 of the South Carolina Constitution, the State may not increase the public debt through a bond issue without first submitting the question to the public in a general election and gaining the approval of two-thirds of the qualified electors. Yet, it is well settled that this constitutional mandate does not apply to the issuance of county bonds. *Zeigler v. Thompson,* 119 S.C. 101, 111 S.E. 880 (1922). Thus, in this case, although County is a division of the State, the issuance of bonds by County does not constitute the issuance of *state* bonds or securities as contemplated by section 15–77–20.

The trial court further held in its order that state securities are implicated because UMA is an affiliate of MUSC, which is a state agency. Moreover, this lawsuit will affect the loan obligation and pledge of revenue by UMA to Charleston County. Thus, section 15–77–20 is triggered. Again, the bond ordinance makes clear that the principal and interest of the hospital bonds are payable by County solely out of the revenues derived from the St. Francis project. No obligation is created on the part of County or the State.

We hold that Doctors are not required to follow the procedure set forth in section 15–77–20 to institute this action.

### D. CONFLICT OF INTEREST

Doctors alleged in their complaint that the bond issue was unlawful because Dr. Wallace, a county council member, had a conflict of interest and voted on the ordinance. Doctors alleged that Dr. Wallace worked under and was paid by UMA.

On October 11, 1996, the South Carolina Ethics Commission issued an informal opinion to the Deputy County Attorney,

stating that Dr. Wallace should disqualify himself from any issues concerning the revenue bonds.[8] The opinion was based on the Ethics Reform Act of 1991—S.C.Code Ann. § 8–13–700(B) (Supp.1995).[9] Doctors alleged that Dr. Wallace disregarded this advice and cast a tie-breaking vote in favor of issuing the bonds on December 17, 1996.

In granting summary judgment on this issue, the trial court made the following conclusions: (1) under *Bear Enterprises v. County of Greenville,* 319 S.C. 137, 459 S.E.2d 883 (Ct.App. 1995),[10] a court cannot conceivably examine individual votes on every legislative matter that a citizen may not agree with; (2) under the Enrolled Bill Rule,[11] the court cannot go behind the collective action of council; (3) there is no allegation that Dr. Wallace voted in the third and final reading; (4) the court does not have jurisdiction to review the conflict of interest

8. The opinion stated: "while the end result of a benefit or detriment [to UMA] may be remote in time and effect, it is my informal opinion that Dr. Wallace should disqualify himself. . . ."

9. Section 8–13–700(B) provides in part:

 No public official, public member, or public employee may make, participate in making, or in any way attempt to use his office, membership, or employment to influence a governmental decision in which he, a member of his immediate family, an individual with whom he is associated, or a business with which he is associated has an economic interest.

10. In *Bear Enterprises,* the issue was whether county council's passage of a zoning ordinance was arbitrary and capricious. In upholding the discretion of the zoning authority, the Court noted that it was improper for anyone to interrogate county council members individually in order to impeach the council's decision. 459 S.E.2d at 885 n. 1.

11. The Enrolled Bill Rule as stated in *State ex rel. Hoover v. Town Council of Chester,* 39 S.C. 307, 17 S.E. 752, 755 (1893) is as follows:

 We announce that the true rule is that, when an act has been duly signed by the presiding officers of the general assembly, in open session in the senate and house, approved by the governor of the state, and duly deposited in the Office of the Secretary of State, it is sufficient evidence, nothing to the contrary appearing upon its face, that it passed the general assembly and that it is not competent either by the journals of the two houses or either of them, or by any other evidence, to impeach such an act. And this being so, it follows that the court is not at liberty to inquire into what the journals of the two houses may show as to the successive steps which may have been taken in the passage of the original bill.

claim; and (5) the record fails to substantiate a conflict of interest on the part of Dr. Wallace.

 A threshold issue for this Court is whether invalidation of the bond ordinance is a proper remedy for a violation of the State Ethics Act. There is no direct authority which prevents this Court from invalidating a bond ordinance based upon a violation of the State Ethics Act.[12] In general, the vote of a council member who is disqualified because of interest or bias in regard to the subject matter being considered may not be counted in determining the necessary majority for valid action. *See* W.J. Dunn, Annotation, *What Constitutes Requisite Majority of Members of Municipal Council Voting on Issue,* 43 A.L.R.2d 698, 748 (1955). Therefore, a court has jurisdiction to invalidate an ordinance if the requisite number of votes to pass the ordinance would not exist but for the improper vote.

 Furthermore, the trial court's reliance on the Enrolled Bill Rule and *Bear Enterprises* is misplaced here. Doctors are not attempting to go behind the actions of county council, but are simply arguing that Dr. Wallace's conflict of interest and his vote on December 17 should, on its face, invalidate County's passage of the bond ordinance. Thus, Doctors have stated a claim upon which relief can be granted. County's motion to dismiss should not have been granted on this issue. In addition, a genuine issue of material fact exists as to whether Dr. Wallace in fact had a conflict of interest and whether any such conflict warrants invalidation of the ordinance. Therefore, summary judgment on this issue is improper at this stage of the proceedings. *See Baughman v. AT & T,* 306 S.C. 101, 410 S.E.2d 537 (stating that since it is a drastic remedy, summary judgment should be cautiously invoked so that no person will be improperly deprived of a trial of the disputed factual issues).

---

12. S.C.Code Ann. § 8–13–780 (Supp.1997) provides the remedies for a breach of the State Ethics Act. Section 8–13–780(A) provides: "The provisions of this section are in addition to all other civil and administrative remedies against public officials, public members, or public employees which are provided by law." Thus, the remedies outlined in section 8–13–780 are not exclusive.

### E. "HOSPITAL AGENCY" OR "PUBLIC AGENCY"

Under the Act, "the several counties of the State functioning through their respective county boards shall be empowered: (1) To enter into agreements with any *hospital agency* or *public agency* necessary or incidental to the issuance of bonds...." S.C.Code Ann. § 44–7–1440 (1985) (emphasis added). Doctors alleged in their complaint that UMA was neither a hospital agency nor a public agency and, therefore, the bonds could not be issued for UMA's benefit.

The Act defines *hospital agency* as "any person, firm, corporation, association, or partnership whether for profit or not for profit, existing or created at any time and empowered to acquire, by lease or otherwise, operate and maintain hospital facilities." S.C.Code Ann. § 44–7–1430(e) (Supp.1997). *Public agency* is defined as "any county, city, town, or hospital district of the State existing or created at any time pursuant to the laws of the State authorized to acquire, by lease or otherwise, operate, and maintain hospital facilities." S.C.Code Ann. § 44–7–1430(j) (Supp.1997).

 UMA is described as a non-profit corporation formed as a billing and collecting agent for the clinical practice of medicine at MUSC. *Proveaux v. MUSC,* 326 S.C. 28, 482 S.E.2d 774, 775. UMA is an operation of MUSC's Clinical Practice Plan. *Higgins v. MUSC,* 326 S.C. 592, 486 S.E.2d 269 (Ct.App.1997). The factual dispute here involves whether UMA is "empowered to acquire, by lease or otherwise, operate and maintain hospital facilities." *See* S.C.Code Ann. § 44–7–1430(e). We therefore find that the motion to dismiss should not be granted on this issue because Doctors have stated a claim upon which relief can be granted. Moreover, summary judgment is also improper because there is a genuine issue of material fact as to whether UMA qualifies as a "hospital agency."

### F. CORPORATE PRACTICE OF MEDICINE

Doctors alleged in their complaint that UMA is illegally engaged in the corporate practice of medicine. Doctors argue that the bonds should not be issued because, otherwise, County would be aiding and abetting UMA in the commission of this unlawful activity. The trial court concluded that nothing

presented in the case established any illegality by UMA. The trial court further held that, in the alternative, the enjoining of any alleged illegal activities must be directed against UMA, and not against County.

 South Carolina has a common law prohibition against the corporate practice of medicine. *McMillan v. Durant*, 312 S.C. 200, 439 S.E.2d 829 (1993); *Wadsworth v. McRae Drug Co.*, 203 S.C. 543, 28 S.E.2d 417 (1943); *Ezell v. Ritholz*, 188 S.C. 39, 198 S.E. 419 (1938). In their complaint, Doctors asked the trial court to enjoin the commission of a crime, *i.e.*, the aiding and abetting of the corporate practice of medicine. In general, the rule is that equity has no criminal jurisdiction and will not enjoin the commission of a crime solely for the purpose of enforcing the criminal laws. *State ex rel. McLeod v. Holcomb*, 245 S.C. 63, 138 S.E.2d 707 (1964). However, the fact alone that the wrongs complained of are accompanied by, or are, violations of the criminal law will not displace the jurisdiction of equity to exercise its injunctive powers to prevent such wrongful acts whenever there are other facts present which afford a basis for the exercise of equitable jurisdiction. *Id.; Ezell v. Ritholz*, 188 S.C. 39, 198 S.E. 419. In *Ezell*, this Court held that a licensed professional could sue to enjoin others, including corporations, from unlawfully engaging in the practice of such profession. This Court found that the unlawful practice of the profession infringed upon the property and pecuniary rights of those licensed to practice.

 It is generally unlawful for a person to aid and abet the commission of a crime. *See, e.g., State v. Leonard*, 292 S.C. 133, 355 S.E.2d 270 (1987) (stating that in order to be guilty as an aider or abettor, the participant must be chargeable with knowledge of the principal's criminal conduct). Under *Ezell*, it is equally logical that a licensed physician could sue to enjoin someone from aiding and abetting another in the unlawful practice of medicine. However, in this case, we find that Doctors have failed to state facts sufficient to constitute a cause of action. The Act expressly empowers counties "to finance the acquisition, enlargement, improvement, construction, equipping and providing of such hospital facilities to the end that the public health and welfare of the people of the

State will be promoted...." S.C.Code Ann. § 44–7–1420(4) (1985). The Act further permits a county to enter into agreements with corporations necessary or incidental to the issuance of bonds. S.C.Code Ann. § 44–7–1430 (1985). The possibility that a corporation will use hospital bond proceeds to engage in the unlawful practice of medicine does not by itself impugn a county's decision to issue such bonds. We agree with the trial court that the proper avenue for relief for Doctors is to seek an injunction directly against UMA.

### CONCLUSION

Based on the foregoing, the trial court is **AFFIRMED IN PART AND REVERSED IN PART.**

MOORE, WALLER and BURNETT, JJ., and Acting Associate Justice DIANE SCHAFER GOODSTEIN, concur.