548 S.E.2d 605

Shonya Renee PARKS, Respondent,

v.

CHARACTERS NIGHT CLUB and Thomas Schweitzer,
d/b/a Characters, Defendants,

Of whom Thomas Schweitzer, d/b/a Characters is Appellant.

Thomas Schweitzer, d/b/a Characters,
Third Party Plaintiff, Appellant,

v.

Kenneth Antoine Smith, Third Party Defendant, Respondent.

No. 3342.

Court of Appeals of South Carolina.

Heard May 7, 2001.

Decided May 21, 2001.

O.W. Bannister, Jr., of Greenville, for Appellant.

David B. Greene, of Greenville, for Respondent.

ANDERSON, Judge:

In this negligence action, Characters and Thomas Schweitzer, who is President of the corporation that owns Characters, appeal the magistrate's denial of their motion for an involuntary nonsuit as well as the nonjury verdict in favor of Shonya Parks. They argue there was no evidence Characters was negligent or that Parks' injury was reasonably foreseeable. We reverse.

## FACTS/PROCEDURAL BACKGROUND

On June 12, 1996, seventeen-year-old Shonya Parks attended "Teen Night" at Characters nightclub in Greenville, South Carolina. Parks was accompanied by her cousin, Tomika Miles, and two of Tomika's friends. At the nightclub, Parks ran into Kenneth "Tweek" Smith, her "ex-boyfriend" and the father of her child.[1]

While in the club, Parks and Smith had a disagreement. Smith pulled Parks' arm in an attempt to force her to walk off with him. Parks told security, who kept Smith away from her. Sometime later in the evening, Parks and Smith "made up." When the club closed around midnight, Smith walked Parks to her car.

Smith stood nearby while Parks and her companions entered Parks' 1989 Suzuki. As Parks waited to pull out of the parking lot, a thrown object broke the car window and struck her in the head, knocking her sideways into her cousin's lap. The object was later discovered to be a billiard ball. Smith

---

1. After the incident, Parks and Smith had another child together.

pulled Parks out of the car and held her until Characters' security arrived.

On hearing the ball strike Parks' vehicle, Jimmy Chambers, the owner and operator of Eagle Security, immediately went to help Parks. Chambers observed Smith holding Parks. Additionally, Chambers overheard Smith telling Parks that he was "sorry, he [didn't] know why he did it." Chambers testified Smith confessed to a police officer who later arrived at the scene. Several passengers in Parks' jeep yelled for Chambers to arrest Smith. One of the girls told Chambers "he did it, he did it." Parks, however, did not want police to arrest Smith.

According to Chambers, Smith said "he was sorry for doing it and all that. He didn't know why he meant to hit—I just meant to hit your car, I didn't mean to hit you." When asked by Chambers where he got the ball, Smith replied: "I took it from inside." An ambulance transported Parks to the hospital where she was apparently treated and released. Parks' actual damages totaled $969.65.

Parks filed this action against Thomas Schweitzer, doing business as Characters, alleging Characters was negligent in failing to break up a fight in the club's doorway and this negligence proximately caused the billiard ball to strike her in the head.

Schweitzer and Characters answered denying negligence on their part and the existence of a fight. Schweitzer impleaded Smith as a third-party defendant pursuant to Rule 14(a), SCRCP, asserting Smith threw the ball and was liable for all or part of the damages.[2]

At the nonjury trial in Magistrate's Court, Parks testified: "I was sitting still waiting for the traffic and a cue ball came from behind-like on the side-not the side but like behind me and hit me in the head." Parks did not see the ball coming. She admitted she did not see who threw the ball or from where it was thrown. Parks nonetheless insisted the ball was thrown from behind her vehicle.

---

**2.** Smith's relationship with Parks had been violent in the past resulting in two arrests for criminal domestic violence.

Parks attested two boys from Easley were fighting behind her car and one of them threw the ball that hit her. Parks, however, conceded she did not see anyone fighting with a billiard ball. Further, Parks admitted she did not see whether the "boys from Easley" had a billiard ball in their possession. During cross examination of Parks, the following exchange occurred:

Q. You can't tell us that either one of these boys from Easley threw that pool ball, can you?

A. No.

Parks stated she did not "notice" if anyone from Characters attempted to "break up" the fight. She was not sure the fight was on Characters' property. The fight was in a parking lot next door to Characters.

Miles testified Smith was standing in front by the roadway when the ball struck Parks' car from the left. She looked at him approximately thirty seconds before the accident. Like Parks, Miles did not see who threw the ball. Miles stated she saw the boys from Easley fighting and recognized both of them. She denied asking anyone at the scene to arrest Smith. Miles agreed Smith was a "pretty violent person." After brief testimony from Parks' mother, who was not present at the time of the accident, Parks rested her case.

Schweitzer and Characters moved for an involuntary nonsuit and dismissal pursuant to Rule 41(b), SCRCP, arguing Parks failed to demonstrate (1) her injury was foreseeable; (2) who threw the ball; and (3) security was inadequate.

The magistrate denied the motion. Characters then presented evidence from Schweitzer and Chambers. Schweitzer testified Characters had more than twenty security people on the premises for "Teen Night" to control a crowd of approximately eight hundred patrons. Of these twenty security people, six were uniformed, armed, security personnel from Eagle Security. The remainder of the security people were Characters' employees. Two security guards patrolled the parking lot. As the club closed around midnight, security personnel moved with the crowd to the parking lot outside.

All of the security personnel were outside when Parks was struck by the ball. They were equipped with radios and

maintained constant communication with each other. At least four security people were in the parking lot. Chambers contended if there had been a fight in the parking lot, he would have known about it. No one reported a fight that night.

Chambers averred he was no more than sixty to seventy feet from Parks' car when he heard what he thought was a gunshot. According to Chambers, the driver's side window of Parks' Suzuki was broken. Chambers found a cue ball lying in the passenger seat of Parks' vehicle.

Based on the physical evidence, Chambers opined the billiard ball was thrown from the sidewalk at the front of the vehicle. Chambers explained: "The window on the Suzuki was a perfect circle-I mean a perfect circle. And it wasn't from an angle from behind, it was an angle from the front. It was exactly as if you just pointed straight at the vehicle from the curb, where this young black guy [Smith] had run from to the Suzuki. From the position he was there then run to it, just like it came straight there."

At the close of all the evidence, the magistrate held there was no evidence Smith was negligent and Characters was "somewhat negligent in failing to patrol the grounds so as to avoid plaintiff's injury." The magistrate ordered Characters to pay one-half of Parks' damages plus court costs.

Characters appealed the verdict to the Circuit Court. The Circuit Court judge affirmed the magistrate's order finding it was supported by evidence of a fight occurring at approximately the same time as the incident. Schweitzer and Characters appeal.

## STANDARD OF REVIEW

In deciding whether to grant or deny a motion for nonsuit, the trial court must view the evidence and all reasonable inferences in the light most favorable to the plaintiff. *Bullard v. Ehrhardt*, 283 S.C. 557, 324 S.E.2d 61 (1984). If there is no relevant competent evidence reasonably tending to establish the material elements of the plaintiff's case, a motion for nonsuit must be granted. *Id.*

Because this case originated in Magistrate's Court, South Carolina Code Ann. section 18-7-170 (1985) is applicable. Section 18-7-170 provides that on appeal from Magistrate's Court, the Circuit Court may make its own findings of fact. *See Dingle v. Northwestern R.R.,* 112 S.C. 390, 99 S.E. 828 (1919); *Truluck v. Atlantic Coast Line R.R.,* 110 S.C. 92, 96 S.E. 254 (1918); *A. & E. Leather Goods Co. v. Sentz,* 87 S.C. 267, 69 S.E. 390 (1910); *Redfearn v. Douglass,* 35 S.C. 569, 15 S.E. 244 (1892); *Vacation Time of Hilton Head Island, Inc. v. Kiwi Corp.,* 280 S.C. 232, 312 S.E.2d 20 (Ct.App.1984).

▓▓ However, on appeal from a Circuit Court's affirmance of a magistrate's order, our scope of review is more limited. The Court of Appeals will presume that an affirmance by a Circuit Court of a magistrate's judgment was made upon the merits where the testimony is sufficient to sustain the magistrate's judgment and there are no facts that show the affirmance was influenced by an error. of law. *Hadfield v. Gilchrist,* 343 S.C. 88, 538 S.E.2d 268 (Ct.App.2000). We therefore look to whether the Circuit Court order is controlled by an error of law or is unsupported by the facts.

The Circuit Court order provided:

> Magistrate's ruling is affirmed. Under *Miletic v. Wal-Mart Stores, Inc.,* ... there is no duty unless the merchant or owner has knowledge or reason to know of criminal acts about to occur. Evidence was presented to magistrate that there was a fight and this incident occurred in approximately the same time frame. There is evidence to support the judge's conclusion that Characters had knowledge of activity that could lead to this incident. (i.e.foreseeable).

### LAW/ANALYSIS

On appeal, Schweitzer and Characters (referred to in this section collectively as "Characters") argue the magistrate erred in denying their motion for nonsuit and in awarding damages to Parks. They contend there was no evidence in the record to support the finding of negligence. In particular, they assert Parks failed to show her injury was foreseeable and proximately caused by the alleged fight. Characters further maintains it did not have either actual or constructive notice of a fight.

■ Because this was an action sounding in negligence, Parks was required to allege and prove: (1) the defendant owed her a duty of care; (2) the defendant breached that duty of care; and (3) the defendant's breach proximately caused her damage. *See Bishop v. South Carolina Dep't of Mental Health,* 331 S.C. 79, 502 S.E.2d 78 (1998); *Jeffords v. Lesesne,* 343 S.C. 656, 541 S.E.2d 847 (Ct.App.2000); *Hubbard v. Taylor,* 339 S.C. 582, 529 S.E.2d 549 (Ct.App.2000).

■ This case hinges on whether Characters breached a duty owed to Parks and whether this breach was the proximate cause of Parks' injuries. It is apodictic that a plaintiff may only recover for injuries proximately caused by the defendant's negligence. *Olson v. Faculty House,* 344 S.C. 194, 544 S.E.2d 38 (Ct.App.2001).

■ To prove causation, a plaintiff must demonstrate both causation in fact and legal cause. *Id.* Causation in fact is proved by establishing the plaintiff's injury would not have occurred "but for" the defendant's negligence. *Id.* Legal cause turns on the issue of foreseeability. *Id.* An injury is foreseeable if it is the natural and probable consequence of a breach of duty. *Id.* Foreseeability is not determined from hindsight, but rather from the defendant's perspective at the time of the alleged breach. *Id.* It is not necessary for a plaintiff to demonstrate the defendant should have foreseen the particular event which occurred but merely that the defendant should have foreseen his or her negligence would probably cause injury to someone. *Greenville Mem'l Auditorium v. Martin,* 301 S.C. 242, 391 S.E.2d 546 (1990).

Parks' complaint averred Characters had a duty to break up the alleged fight and its negligent failure to do so caused her injury. Specifically, the complaint alleged:

That at said time and place the plaintiff was in her car on defendant's property and was preparing to leave the premises; that she was waiting for traffic to clear; that suddenly and without warning a projectile, later determined to be a billiard ball, crashed through her car window and hit her in the head, knocking her unconscious and causing her grievous bodily injury; that the billiard ball was thrown by one of several men who were in a fight at the doorway of defendant's night club; and that defendant's agents were

making no effort to control the situation or to stop said fight.

Our Supreme Court first addressed the extent of a business's duty to protect invitees [3] from the criminal activity of third parties in the landmark case of *Shipes v. Piggly Wiggly St. Andrews, Inc.,* 269 S.C. 479, 238 S.E.2d 167 (1977).

In *Shipes,* a shopper was attacked as he walked to his car in a grocery store parking lot. The shopper alleged the store failed to adequately light and supervise the parking area either because (1) existing lamps were not shining brightly enough or (2) they were not turned on. In this case of first impression, the Court recognized that while the owner of a business is not generally charged with a duty to protect customers from criminal acts by third parties, an intervening criminal act by a third party may not always release an owner from liability for negligence. *Shipes,* 269 S.C. at 483, 238 S.E.2d at 168.

The Court discussed the Restatement (Second) of Torts section 344, which provides:

A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and *by the failure of the possessor to exercise reasonable care to (a) discover that such acts are being done or are likely to be done* .... (emphasis added).

Restatement (Second) of Torts § 344 (1965). Comment f to section 344 explains further the duty of the storeowner:

---

**3.** An invitee is "one who enters upon the premises of another at the express or implied invitation of the occupant, especially where he is on a matter of mutual interest or advantage." *Crocker v. Barr,* 305 S.C. 406, 411–12, 409 S.E.2d 368, 371 (1991)(citing *Parker v. Stevenson Oil Co.,* 245 S.C. 275, 280, 140 S.E.2d 177, 179 (1965)). *See also Sims v. Giles,* 343 S.C. 708, 716, 541 S.E.2d 857, 862 (Ct.App.2001)(" 'Invitees are limited to those persons who enter or remain on land upon an invitation which carries with it an implied representation, assurance, or understanding that reasonable care has been used to prepare the premises, and make them safe for their reception.' The visitor is considered an invitee especially when he is upon a matter of mutual interest or advantage to the property owner.")(quoting Restatement (Second) of Torts § 332 cmt. a (1965)(additional citations omitted)).

Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. . . . If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.

Restatement (Second) of Torts § 344 cmt. f (1965).

The *Shipes* Court held the storeowner was not liable. The Court concluded the storeowner did not know or have reason to know of criminal attacks on shoppers. Thus, the storeowner was not under a duty to protect against such attacks. Furthermore, even assuming the storeowner had a duty to provide adequate lighting to prevent assaults, Shipes failed to show a breach of this duty. Shipes presented no proof the storeowner had actual or constructive knowledge the lights were out.

. Approximately three years after *Shipes,* the Supreme Court revisited the question of a business owner's duty to protect customers in *Munn v. Hardee's Food Systems, Inc.,* 274 S.C. 529, 266 S.E.2d 414 (1980). In *Munn,* a racially motivated fight began on the premises of a Hardee's restaurant as it was closing. The fight occurred outside the restaurant. Munn was fatally stabbed in the fight. His beneficiaries filed a wrongful death action against Hardee's. Several hours prior to the fatal fight, there had been another racially motivated incident at the location involving different persons.

The *Munn* Court reaffirmed the *Shipes* holding that a business owner is not charged with a duty to protect customers from the criminal acts of third parties unless the owner knew or had reason to know that such acts were occurring or about to occur. *Id.* at 531, 266 S.E.2d at 414–15. The Court found there was no evidence in the record that Hardee's knew or should have known the spontaneous fight was about to occur. Counsel for the Administrator of Munn's Estate attempted to overcome the momentary and impulsive nature of the incident by arguing Hardee's was liable because it "know-

494

ingly allowed an atmosphere of unrest to exist at its establishment which precipitated violence." *Id.* at 531, 266 S.E.2d at 415. The Court held there was no evidence to support this allegation. The prior racial incident was unrelated and Hardee's did not know or have reason to know the fight would occur. The evidence was therefore insufficient to sustain the judgment against Hardee's. *Id.* at 531–32, 266 S.E.2d at 415.

The Court next addressed this question in *Bullard v. Ehrhardt*, 283 S.C. 557, 324 S.E.2d 61 (1984). Minnie Bullard filed a negligence action against the owner of Two Notch Billiards for injuries she received when an inebriated customer, Billy Ford, threw a beer bottle which struck Bullard in the eye while she was an invitee in the pool hall. Although the owner of the tavern had asked Ford to leave prior to the incident, Ford returned shortly thereafter and within seconds threw the bottle that injured Bullard. The trial court granted a nonsuit in favor of the tavern owner.

The Supreme Court affirmed finding the owner had no forewarning Ford would throw the bottle and, therefore, no duty arose which the owner could breach. The Court reiterated the rule that a business owner has a general duty to exercise reasonable care in protecting its invitees but is not liable for criminal attacks by third parties in the absence of evidence the owner knew or had reason to know of the attack. *Bullard*, 283 S.C. at 559, 324 S.E.2d at 62. *Accord Wintersteen v. Food Lion, Inc.*, 344 S.C. 32, 542 S.E.2d 728 (2001).

Despite these early cases, some South Carolina courts have found evidence a business owner's negligent behavior may have proximately caused a criminal attack on an invitee. In *Daniel v. Days Inn of America, Inc.*, 292 S.C. 291, 356 S.E.2d 129 (Ct.App.1987), three men sexually assaulted Daniel for five or six hours in a Days Inn hotel room before she escaped. This Court reversed a grant of summary judgment to the hotel finding evidence (1) the hotel was in a high crime area; (2) Daniel repeatedly uttered "bloody screams" during the five or six hour attack and torture; and (3) the hotel failed to follow its own security guidelines or to regularly patrol the premises. One inference from the testimony of a guest who overheard Daniel's screams was that security, if it had patrolled, would have heard the screams and intervened to free Daniel from the room in which she was held.

In *Greenville Memorial Auditorium v. Martin,* 301 S.C. 242, 391 S.E.2d 546 (1990), a bottle-throwing case, the Supreme Court found evidence existed from which a jury could have found plaintiff's injuries from a criminal act were foreseeable and that Greenville Memorial Auditorium was liable. In reaching this conclusion, the Court appears to have relied on the rule from comment f to section 344 of the Restatement (Second) of Torts providing "[i]f the place or character of [an owner's] business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection." Restatement (Second) of Torts § 344 cmt. f (1965).

Martin attended a rock concert at the auditorium. During the concert, an unknown person threw a bottle from the auditorium's balcony. The bottle struck and injured Martin, who filed suit claiming the city's negligence in securing the premises during the concert created an unreasonable risk of harm and proximately caused Martin's injury.

The record demonstrated the city only employed fourteen security guards to manage a crowd of six thousand people. There was no reserved seating on the main floor. Many patrons of the concert were unruly and openly drinking liquor. The floor was littered with liquor bottles and pieces of glass. Some patrons smoked marijuana during the concert.

At trial, the auditorium's director of security acknowledged reserved seating would have assisted security personnel in seeing into the crowd. The director further testified the group, Loverboy, performed songs which encouraged the use of drugs and alcohol, and increased the potential for security problems. Based on this evidence that the auditorium's negligent security created a dangerous situation, the Court held a jury could find Martin's injuries were foreseeable. *Id.* at 245–46, 391 S.E.2d at 548.

A case finding no evidence supporting negligence and foreseeability is *Callen v. Cale Yarborough Enterprises,* 314 S.C. 204, 442 S.E.2d 216 (Ct.App.1994). Callen was injured in a fight in the drive-through lane of a Sumter Hardee's after he got into an argument with a man in the car in front of his car.

When Callen got out of the car, the man picked up a board and struck Callen in the face. *Id.* at 205, 442 S.E.2d at 217. Callen stated he "had no warning whatsoever" of the attack. *Id.*

Relying on *Munn* and *Shipes,* this Court affirmed the grant of summary judgment to Hardee's. The Court determined: "Hardee's is a fast-food restaurant which serves no alcohol. It certainly does not fit the description of an operation which attracts or provides a climate for crime. There was no evidence Hardee's knew or had reason to know the violent act in question was occurring or about to occur." *Id.* at 206, 442 S.E.2d at 218.

In *Dalon v. Golden Lanes, Inc.,* 320 S.C. 534, 466 S.E.2d 368 (Ct.App.1996), this Court affirmed the denial of Golden Lanes' motions for directed verdict and judgment notwithstanding the verdict. While he was in the Golden Lanes entertainment center, Dalon was stabbed by another customer named Carroll, who had caused trouble at the center on other occasions and had been intoxicated several times. On the night of the stabbing, a Golden Lanes security guard broke up a fight between Carroll and Dalon in the parking lot of the center. The security officer heard Carroll threaten to cut Dalon's throat. Despite this fact, the officer sent Carroll back inside the center. Carroll returned to the parking lot and began yelling for Dalon. The security guard instructed Carroll to return to the center. Carroll pulled out a knife and moved toward Dalon. At that point, Dalon ran into the center. Carroll followed and stabbed Dalon.

This Court ruled:

Viewing the evidence in the light most favorable to Dalon, Golden Lanes was aware of Carroll's apparent propensity to cause trouble and had permitted him to return to its premises despite the trespass notices issued by its security personnel. The officer on duty broke up the initial fight between Dalon and Carroll and heard Carroll threaten to cut Dalon's throat. Rather than escort Carroll from the scene, the officer sent him back inside the bowling alley and began to question Dalon. Carroll returned with his knife and events led to the stabbing of Dalon. There is more than one reasonable inference to be drawn from the evidence in this case as to whether Golden Lanes exercised reasonable care

in providing security under the circumstances given its specific knowledge about Carroll's past conduct.

*Dalon,* 320 S.C. at 539–40, 466 S.E.2d at 371.

The pendulum swung back in *Miletic v. Wal–Mart Stores, Inc.,* 339 S.C. 327, 529 S.E.2d 68 (Ct.App.2000), in which this Court found no evidence of foreseeability despite other criminal activity in or near the shopping center's parking lot from which a shopper was abducted and robbed at gunpoint. Because the other crimes were unrelated and did not involve abductions, Wal–Mart had no duty to protect Miletic from an attack like the one she suffered. As Miletic left Wal–Mart and got into her car, two men ran toward her, put a gun to her head, forced her into the back seat of her car, and drove away in her car with her. The men later released Miletic after taking her money and credit cards. *Id.* at 329, 529 S.E.2d at 68.

The Court noted Wal–Mart is not the type of operation that attracts or provides a climate for crime. In the two years prior to Miletic's abduction, the only crime involving Wal–Mart was a larceny, not an assault, car jacking, or kidnapping. Further, the Court emphasized the attack occurred so quickly even the victim had no prior notice of it.

More recently, in *Jeffords v. Lesesne,* 343 S.C. 656, 541 S.E.2d 847 (Ct.App.2000), this Court examined whether a bar should have foreseen the criminal act of a customer who injured Jeffords. Jeffords attended an "End of Summer Bash" at a bar known as "The Watering Hole." As Jeffords waited to play pool, another customer, Chris Driggers, claimed ownership of several quarters which Jeffords had placed on the edge of the pool table. When Jeffords disputed Driggers' ownership of the quarters, Driggers abruptly hit Jeffords in the mouth with his pool cue, causing Jeffords severe injuries.

Jeffords brought a negligence action against Bonneau Lesesne, individually and doing business as the "Watering Hole," asserting three allegations of negligence creating a reasonably foreseeable risk of third party conduct such as the assault by Driggers. Jeffords specifically argued: "(1) the defendant failed to secure and maintain the premises in a reasonably safe condition; (2) the defendant failed to employ adequate security guards; and (3) the defendant failed to adequately warn Jeffords." *Id.* at 660, 541 S.E.2d at 849. The trial court

found no evidence to support a conclusion that the allegations of negligence were a proximate cause of Jeffords' injuries. The court directed a verdict in favor of the defendant.

As in *Greenville Memorial Auditorium v. Martin*, 301 S.C. 242, 391 S.E.2d 546 (1990), the *Jeffords* Court focused on the *place* and *character* of the business and whether it created a dangerous climate for criminal activity rather than on the spontaneous nature of the criminal act involved. The Court noted the "End of Summer Bash" was promoted by a local radio station that broadcast from the parking lot. The establishment offered prizes to customers and played music on large speakers in the parking lot. Despite these efforts to draw a large crowd to a "high crime area," the owner did not provide a doorman or other security measures such as bouncers or wait staff. The Court found: "[T]he evidence as to the special promotion and the crowd lends itself to the inference that a more frenzied atmosphere was cultivated by Lesesne." *Id.* at 665, 541 S.E.2d at 851. The Court concluded the place and character of the "End of Summer Bash" "was such as to raise a factual issue concerning the reasonable foreseeability of [criminal] conduct and the necessity of taking reasonable precautions, such as providing security or a reasonably sufficient number of servants, to afford protection." *Id.* at 664, 541 S.E.2d at 851.

As further evidence of foreseeability, the Court found it "compelling" that prior to the attack, Driggers had been "loud, obnoxious, aggressive, disheveled in appearance, glassy eyed, and 'even a little intimidating.' " *Id.* at 663, 541 S.E.2d at 850. It was obvious Driggers " 'had been drinking probably quite a while.' " *Id.* Less compelling was the spontaneity of the attack. "Even though the actual assault by Driggers may have been so swift that it could not have been stopped once it began, a factual issue is presented as to whether that type of criminal conduct was a foreseeable risk created by the place and character of Lesesne's business activities on that evening." *Id.* This Court concluded the trial judge erred in directing a verdict as to the negligence of Lesesne in creating a reasonably foreseeable risk of third party criminal conduct such as the assault by Driggers.

Despite the divergence in the above cases, we find *Daniel, Greenville Memorial Auditorium, Dalon,* · and *Jeffords* are

distinguishable from the present case. Those cases contain the common thread of a business that failed to take reasonable security precautions despite actual or constructive notice of danger to customers. *See Daniel,* 292 S.C. at 297, 356 S.E.2d at 132 (stating hotel was in a high crime area and evidence existed hotel personnel failed to implement any of hotel's security policies or procedures); *Greenville Mem'l Auditorium,* 301 S.C. at 245–46, 391 S.E.2d at 548 (finding director of security was on notice patrons had consumed alcohol); *Dalon,* 320 S.C. at 539–40, 466 S.E.2d at 371 ("Viewing the evidence in the light most favorable to Dalon, Golden Lanes was aware of Carroll's apparent propensity to cause trouble and had permitted him to return to its premises despite the trespass notices issued by its security personnel."); *Jeffords,* 343 S.C. at 665, 541 S.E.2d at 851 ("Perhaps most compelling is the evidence as to the condition of Driggers in the minutes prior to the assault. In a light most favorable to Jeffords, Driggers showed signs of intoxication, was obnoxious, and was aggressive for at least several minutes prior to the assault. Consequently, even though the actual manifestation of physical aggression may not have been foreseeable, the fact of the aggression was arguably a natural result of Lesesne's failure to provide sufficient personnel or security to control the premises and warn patrons.").

In contrast, the evidence is undisputed that Characters took precautions and provided numerous security personnel equipped with headsets and radios. These personnel were in constant communication with each other and moved with the patrons outside into the parking lot as the club closed. Parks did not present any evidence the amount of security personnel was inadequate or that Characters failed to follow its own security guidelines. There was no evidence Characters was in a high crime area or that the alleged fight was of such duration as to put Characters on notice of a problem. No one reported a fight that night. Chambers contended if there had been a fight in the parking lot, he would have known about it.

Even assuming, *arguendo,* that there was a fight and Characters was negligent in failing to break it up, Parks failed to present any evidence this breach of duty proximately caused her injury. Neither Parks nor Miles could testify a participant in the alleged fight threw the billiard ball or that the fighters had a billiard ball in their possession.

The evidence further indicates the attack on Parks was unexpected and occurred abruptly. Parks was not involved in an altercation at the time of the attack. The record does not indicate that alcohol was involved in any way.

Neither Parks nor Miles saw who threw the ball or from where it was thrown. The evidence was undisputed that the driver's side window of Parks' car was broken. Additionally, when struck, Parks fell sideways into her cousin's lap. This indicates the ball could not have come from behind Parks' car as Parks alleged. We conclude there is absolutely no evidence in the record indicating Characters' alleged negligence in breaking up the fight proximately caused Parks' injury.

## CONCLUSION

Because of the complete dearth of evidence to support crucial elements of Parks' case, the magistrate erred in denying the motion of Characters and Schweitzer for an involuntary dismissal of the action. Further, the Circuit Court erred as a matter of law in affirming the magistrate. Accordingly, the judgment of the Circuit Court is hereby

**REVERSED.**

HUFF and SHULER, JJ., concur.