573 S.E.2d 805

**Tamera Jean BERGSTROM, Appellant,**

v.

**PALMETTO HEALTH ALLIANCE d/b/a Palmetto Baptist Medical Center of Columbia and d/b/a Baptist Medical Center, Respondent.**

No. 3552.

Court of Appeals of South Carolina.

Heard Sept. 11, 2002.

Decided Sept. 30, 2002.

Rehearing Denied Dec. 19, 2002.

William Isaac Diggs, of Myrtle Beach, for Appellant.

William L. Pope, of Columbia, for Respondent.

ANDERSON, J.:

Tamera Bergstrom sued Palmetto Health Alliance ("the hospital") alleging the hospital was negligent and committed the tort of intentional infliction of emotional distress regarding her purported adoption in 1979. The hospital moved to dismiss the claims and filed a motion to cap the hospital's liability at $100,000. The Circuit Court granted the hospital's motion to dismiss the intentional infliction of emotional distress claim and the motion to cap damages to $100,000. The Circuit Court denied the hospital's motion to dismiss the negligence claim.

At trial, the hospital moved for directed verdict on the negligence claim at the close of the presentation of Bergstrom's evidence. The Circuit Court granted the directed verdict motion. Bergstrom appeals the grant of the hospital's motions for: (1) directed verdict on the negligence claim; (2) dismissal of the intentional infliction of emotional distress claim; and (3) limitation on the hospital's liability to $100,000. We affirm.

### *FACTS/PROCEDURAL BACKGROUND*

Tamera Bergstrom was born on November 16, 1979, at Baptist Medical Center in Columbia. In early 1979, Debbie Daly,[1] Bergstrom's natural mother, became pregnant. Daly was seventeen years old, unmarried, and living at Murrells Inlet. Daly discussed her predicament with a coworker who introduced her to Mary Andrews, the coworker's mother. After speaking with Andrews, Daly began considering placing the baby for adoption. When Daly was six and one-half months into her pregnancy, she visited Andrews in Columbia and lived with her for one week.

During the week Daly lived with Andrews, Andrews took Daly to meet with attorney Joel Padgett where they discussed placing the baby for adoption. Daly did not remember signing any adoption papers at this meeting. Padgett suggested Daly move in with Claire Wilson. Wilson allowed Daly to stay with her in her home rent and expense free until Daly went to the hospital to deliver the baby. While living with Wilson, Daly was told the baby was to be adopted by a hospital administrator and his wife, who was a nurse. Daly was informed that this couple had already adopted three children and would be good parents for the baby.

Daly went to Baptist Medical Center to deliver the baby. Daly testified that the choice of hospital and medical doctors was arranged by Padgett and she had no input in the decision. She stated she never discussed adoption with any of the doctors prior to going to the hospital to deliver the baby. Daly delivered Bergstrom at 7:57 p.m. She was administered anesthesia in the delivery room. Daly never saw Bergstrom.

The hospital had procedures in place at the time to govern the conduct of hospital employees in adoption situations. These policies read:

### ADOPTION

### DEFINITION AND PURPOSE

---

1. Debbie Daly's last name is spelled two different ways in the record. It is spelled "Daly" and "Daley." In the appellant's brief, her last name is spelled "Daley." In the respondent's brief, her last name is spelled "Daly." We use the "Daly" spelling throughout the opinion.

To provide service for those mothers who wish to consider adoption for their newborn.

POLICY

1. Have the mother sign "Permit" to Release Baby for Adoption.

2. The mother and/or her immediate family may see the infant at any time prior to discharge.

3. Adoptive parents are not to see the infant while the baby is in the hospital.

4. A social service referral should be made if the mother has not made previous arrangements.

5. Have attorney or caseworker sign circumcision permit for male infants.

RESPONSIBLE PERSONS

RN, LPN, Unit Manager

GENERAL INSTRUCTIONS

1. Call Social Service Department at BMCC if there are questions about adoption.

2. In private adoptions, have attorney ask adoptive parents if they would like a Home Health Referral for baby care instructions.

3. Mother may view infant through the nursery window or in her room if she requests.

4. Mother's immediate family may view the infant through the nursery window.

PROCEDURE

. . . .

1. Notify the Unit Manager when mother is ready to sign "Permit for Release of Baby for Adoption."

2. Two original forms must be signed. Place one copy on the mother's chart and one copy on the baby's chart.

3. Give discharge instruction to attorney or caseworker.

4. Release baby to attorney or caseworker following Dismissal of Newborn Procedure.

On the day following Bergstrom's birth, Daly began to have second thoughts about placing Bergstrom for adoption. On the third day after the delivery, the day Daly was to leave the hospital, she decided she wanted to see Bergstrom. When

Daly asked whether she could see the baby, the nurse responded, "[a]re you the adopting parent?" When Daly answered no, the nurse told her "the baby was being placed up for adoption and that [she] couldn't see the child."

Daly returned to her room and began crying. When Wilson arrived to pick Daly up, she asked why Daly was crying. Daly told her the hospital would not let her see the baby and that she did not want to give the baby up for adoption. Wilson told Daly there was nothing Daly could do at that point, the papers had already been signed, and the adoption was final. Daly testified that, during the length of her stay at the hospital, none of the hospital staff came and spoke with her about the adoption. Daly stated Wilson told her she needed to sign a release form before she left the hospital. As Daly was leaving the hospital, she signed the form, which provided:

PERMISSION TO RELEASE BABY TO PARTY OTHER THAN MOTHER

I, the undersigned, mother of Baby Gardner, [Daly's maiden name] who was born in the South Carolina Baptist Hospital, Columbia, South Carolina on 11/16/79, hereby authorize and direct the ... [h]ospital to release and deliver said baby to Joel Padgett (Atty) or his or her agents and release and discharge [the hospital] from any claims on account of such release and delivery.

It has been fully explained to me and I understand that this does not in any way affect the permanent custody of my child and is given for the purpose of authorizing the [hospital] to permit the person named above to remove my child from the hospital as an accommodation to me.

After signing the form, Daly left the hospital and stayed with Wilson for three weeks before returning to Murrells Inlet. Daly did not see Bergstrom before leaving.

Padgett's initial plan to have the baby adopted by the hospital administrator fell through and he began to look for someone to adopt her. He found the Bergstroms. Padgett did not file adoption papers and the Bergstroms never obtained legal custody of the baby. Bergstrom declared that she lived in an R.V. with the Bergstroms and their two other children. They moved from campground to campground in various states.

The Colorado state authorities placed Bergstrom in protective custody when she was eleven years old because Mrs. Bergstrom's boyfriend had taken nude photographs of her. When Bergstrom was fourteen, Colorado authorities found that her birth certificate had been fraudulently altered and referred the case to South Carolina authorities to investigate. Detective David Cribb began investigating the birth certificate and found that Daly was Bergstrom's natural mother. After conducting DNA tests to verify that Daly was the mother, the Colorado authorities released Bergstrom to Daly's custody when Bergstrom was fifteen years old.

Bergstrom filed suit against the hospital seeking to recover damages under theories of negligence and intentional infliction of emotional distress. The hospital filed a Rule 12, SCRCP motion to dismiss the claims. The Circuit Court granted the hospital's motion to dismiss the intentional infliction of emotional distress cause of action, denied the motion to dismiss the negligence claim, and found that any recovery available to Bergstrom was limited to $100,000 pursuant to S.C.Code Ann. § 44–7–50. During the trial, the Circuit Court granted the hospital's directed verdict motion on the negligence claim.

## *LAW/ANALYSIS*

### I. Bergstrom's Negligence Claim

Bergstrom argues the Circuit Court erred when it granted the hospital's directed verdict motion on her negligence claim. We disagree.

When reviewing a grant of directed verdict, this Court must determine whether a verdict for the nonmoving party would have been reasonably possible under the facts of the case. *Hanahan v. Simpson*, 326 S.C. 140, 485 S.E.2d 903 (1997). This Court should view the evidence and all the reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party but must also consider facts which are unfavorable to the nonmoving party. *Love v. Gamble*, 316 S.C. 203, 448 S.E.2d 876 (Ct.App.1994). The issue must be submitted to a jury whenever there is material evidence tending to establish the issue in the mind of a reasonable juror. *Hanahan*, 326 S.C. at 149, 485 S.E.2d at 908. However, this rule does not authorize submission of speculative,

theoretical and hypothetical views to the jury. *Id.* When only one reasonable inference can be deduced from the evidence, the question becomes one of law for the court. *Id.*

In order to establish a claim for negligence, the plaintiff must prove the following elements: (1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant's negligent act or omission; (3) resulting in damages to the plaintiff; and (4) the damages proximately resulted from the breach of duty. *Thomasko v. Poole,* 349 S.C. 7, 561 S.E.2d 597 (2002). An essential element in a cause of action for negligence is the existence of a legal duty of care owed by the defendant to the plaintiff. *Bishop v. South Carolina Dep't of Mental Health,* 331 S.C. 79, 502 S.E.2d 78 (1998).

Bergstrom contends the hospital policies governing adoptions created a special relationship between her and the hospital thereby imposing a duty upon the hospital to follow the procedures. She alleges the hospital breached its duty when it failed to allow Daly to see her, failed to have Daly sign a permit to release the baby for adoption, and failed to make a special service arrangement which it was required to do if the mother had not made previous arrangements. We disagree. Any duty which the policies created was between the hospital and the mother, not the hospital and the child.

Bergstrom cites several cases in support of her argument. The cited cases are not persuasive. *Adoptive Parents v. Biological Parents,* 315 S.C. 535, 446 S.E.2d 404 (1994), interprets the special and unusual circumstances clause contained in the South Carolina Adoption Act which must be satisfied in order for prospective out-of-state adoptive parents to adopt a baby born in South Carolina. The case does not discuss duties of a hospital to a baby who may be placed for adoption.

Bergstrom relies on *Sloan v. Edgewood Sanatorium, Inc.,* 225 S.C. 1, 80 S.E.2d 348 (1954), which held a psychiatric hospital owed a duty of care to properly supervise and treat a suicidal patient and was potentially liable for damages when the patient committed suicide while under its care. This case fails to support the argument that the hospital owed a duty to Bergstrom under the facts of the present case.

Although certain adoption policies were not followed by the hospital, the hospital believed it was acting in accordance with Daly's wishes. The medical charts for Daly indicated that Padgett was the attorney who was handling the adoption, obviating the need for the hospital to make a "social service referral" if the mother had not made other arrangements. Alice Rawlinson, the Director of Women and Children's Services for the hospital, conceded the hospital had an obligation to the baby to make certain the baby was released to the birth mother or her designated agent. That was done in this case. Daly signed a form which allowed the baby to be released to Joel Padgett as her designated representative and the hospital did not breach this duty. Any liability the hospital may have for not allowing Daly to see the baby in accordance with its policies is a possible cause of action which lies with Daly and not with Bergstrom.

The duty between the hospital and Bergstrom was to make certain the hospital followed the wishes of Daly regarding the placement of Bergstrom. Daly indicated she had an attorney who was handling the adoption, never asked any employee or representative of the hospital for aid regarding the adoption, and signed a form authorizing the release of Bergstrom to Padgett. The hospital satisfied its duty.

## II. Proximate Cause

Even if we were to find the hospital breached a duty that existed between it and Bergstrom, Bergstrom could not satisfy the requirement that she prove her damages were proximately caused by the hospital.

Negligence is not actionable unless it is a proximate cause of the injury. *Bishop v. South Carolina Dep't of Mental Health*, 331 S.C. 79, 502 S.E.2d 78 (1998). To prove proximate cause, the plaintiff must demonstrate both causation in fact and legal cause. *Parks v. Characters Night Club*, 345 S.C. 484, 548 S.E.2d 605 (Ct.App.2001). Causation in fact is proved by establishing the injury would not have occurred but for the defendant's negligence. *Rush v. Blanchard*, 310 S.C. 375, 426 S.E.2d 802 (1993).

The law regarding legal cause has been recently summarized in *Trivelas v. South Carolina Dep't of Transp.*, 348 S.C. 125, 558 S.E.2d 271 (Ct.App.2001):

> Legal cause turns on the issue of foreseeability. An injury is foreseeable if it is the natural and probable consequence of a breach of duty. Foreseeability is not determined from hindsight, but rather from the defendant's perspective at the time of the alleged breach. It is not necessary for a plaintiff to demonstrate the defendant should have foreseen the particular event which occurred but merely that the defendant should have foreseen his or her negligence would probably cause injury to someone.

*Id.* at 136, 558 S.E.2d at 276 (citations omitted).

In *Works v. Arlington Memorial Hospital*, 782 S.W.2d 309 (Tex.App.1989), a child's adoptive parents brought a negligence action against the hospital alleging the child was abused by other prospective adoptive parents after the child's release from the hospital. The specific allegations of wrongdoing in *Works* are similar to this case and are as follows:

> Arlington Memorial Hospital records and bills, available to the hospital employees at the time of Baby Doe's birth, indicated that [an attorney at law] had agreed to be responsible for the biological mother's hospital expenses and that the child was to be put up for adoption. Though this information was known, the hospital failed to refer the biological mother to any proper child placement agency or social service agency. After its birth, the child was taken from the hospital grounds by [the attorney].... Hospital personnel were present at the time the [attorney] ... took the baby. After being turned over to [third parties] by [the attorney], the baby was severely abused. The hospital failed to involve its own social work department at any point while the natural mother was in the hospital. The hospital failed to investigate the circumstances surrounding the discharge of the biological mother. The hospital failed to ascertain that proper conservatorship papers were held by those persons taking the baby from the hospital grounds. It is asserted that had the hospital acted properly, the

opportunity would not have arisen for the child to be abused.

*Id.* at 311.

Additional facts in the *Works* case indicated the biological mother signed the release form for the child and turned the baby over to the attorney, that no person affiliated with the hospital had any involvement with the adoption of the child, and no one at the hospital attempted to influence the biological mother in connection with her decision about the adoption. *Id.* The Court of Appeals of Texas relied upon expert testimony and determined:

[A] hospital is not supposed to be able to see the future like a fortune teller with a crystal ball; ... [the expert] was not capable of seeing the future like a fortune teller with a crystal ball-that even she could not have predicted, based on the type of information available at the time the child ... left the hospital, that it would be mistreated in the way it allegedly was according to the Works' pleadings.... [The expert] "wouldn't have tried to" make such predictions. [The expert] agreed that for any two people to take a little, innocent baby and beat it up would be aberrational and abnormal behavior and that it would be unforeseeable to [the expert], or to anybody, including the people at the hospital ... that this would occur.

*Id.* at 314.

In ruling that the plaintiff failed to establish proximate cause, the *Works* court articulated: "we conclude as a matter of law that, in light of all the attending circumstances ..., the injuries suffered by the [child] could not reasonably have been anticipated by the hospital as a consequence of any asserted negligent act or omission alleged against it. In short, we conclude that the hospital could not have foreseen the danger to [the child]." *Id.*

We are persuaded by the analysis in the *Works* case and find Bergstrom failed to establish the hospital's actions were the cause of her injury. At the time Bergstrom was born, the hospital could not have foreseen that following Daly's instruc-

tions to release Bergstrom to Padgett would result in her failed adoption by nomadic parents who sexually exploited her. Bergstrom failed to establish legal cause. Concomitantly, the Circuit Court did not err when it granted the hospital's directed verdict motion.

### III. Bergstorm's Intentional Infliction of Emotional Distress Claim

■ Bergstrom maintains the Circuit Court erred when it granted the hospital's Rule 12, SCRCP motion to dismiss the intentional infliction of emotional distress claim. We disagree.

■ Under Rule 12(b)(6), SCRCP, a defendant may move to dismiss based on a failure to state facts sufficient to constitute a cause of action. *Baird v. Charleston County,* 333 S.C. 519, 511 S.E.2d 69 (1999). Generally, in considering a 12(b)(6) motion, the trial court must base its ruling solely upon allegations set forth on the face of the complaint. *Id.; Stiles v. Onorato,* 318 S.C. 297, 457 S.E.2d 601 (1995). If the facts and inferences drawn from the facts alleged on the complaint would entitle the plaintiff to relief on any theory, then the grant of a motion to dismiss for failure to state a claim is improper. *Baird,* 333 S.C. at 527, 511 S.E.2d at 73. In deciding whether the trial court properly granted the motion to dismiss, this Court must consider whether the complaint, viewed in the light most favorable to the plaintiff, states any valid claim for relief. *See Gentry v. Yonce,* 337 S.C. 1, 522 S.E.2d 137 (1999). A motion to dismiss under Rule 12(b)(6) should not be granted if facts alleged and inferences reasonably deducible therefrom entitle the plaintiff to relief under any theory. *Id.*

■ A plaintiff must satisfy the following elements to state a claim of intentional infliction of emotional distress: (1) the defendant intentionally or recklessly inflicted severe emotional distress, or was certain or substantially certain that such distress would result from his conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community; (3) the actions of the defen-

dant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it. *Upchurch v. New York Times Co.*, 314 S.C. 531, 431 S.E.2d 558 (1993); *Ford v. Hutson*, 276 S.C. 157, 276 S.E.2d 776 (1981).

Even viewing the facts and inferences therefrom alleged in the complaint in the light most favorable Bergstrom, we find the complaint failed to state the elements necessary to sustain an intentional infliction of emotional distress cause of action. As stated above when discussing Bergstrom's negligence claim, the facts failed to show that the hospital's conduct was the proximate cause of Bergstrom's injuries. There was no way the hospital was certain or substantially certain that releasing Bergstrom to Padgett as Daly instructed on the release form would result in Bergstrom's abuse by her putative adoptive parents. Furthermore, we cannot say that the hospital's conduct of releasing the baby per Daly's instruction exceeded the bounds of common decency. The Circuit Court did not err when it granted the hospital's motion to dismiss the intentional infliction of emotional distress cause of action.

## CONCLUSION

We rule that, in light of all the attending circumstances, the hospital did not owe a duty of care to Bergstrom. Additionally, Bergstrom failed to establish that any alleged damages were proximately caused by the hospital.

Elementally, the complaint of Bergstrom did not state a cause of action for intentional infliction of emotional distress.

Because we have ruled the hospital is not liable to the plaintiff on any theory, we do not reach the issue in regard to capping the hospital's liability at $100,000. Accordingly, we

**AFFIRM.**

CONNOR and STILWELL, JJ., concur.