596 S.E.2d 42

**Tamera Jean BERGSTROM, Petitioner,**

v.

**PALMETTO HEALTH ALLIANCE d/b/a Palmetto Baptist Medical Center of Columbia and d/b/a Baptist Medical Center, Respondent.**

No. 25807.

Supreme Court of South Carolina.

Heard Jan. 22, 2004.

Decided April 19, 2004.

Rehearing Denied May 25, 2004.

390

---

William Isaac Diggs, of Diggs & Danielsen, LLC, of Myrtle Beach, for Petitioner.

William L. Pope, of Pope & Rodgers, of Columbia, for Respondent.

Justice BURNETT:

We granted the petition of Tamera Jean Bergstrom (Petitioner) for a writ of certiorari to review the Court of Appeals' decision in *Bergstrom v. Palmetto Health Alliance,* 352 S.C.

221, 573 S.E.2d 805 (Ct.App.2002). We vacate the Court of Appeals' opinion in part and affirm in part.

## FACTS/BACKGROUND

Petitioner was born November 16, 1979, at Baptist Medical Center (Hospital) to a 17–year–old unwed mother (Mother). Hospital and Mother's obstetrician records reflect that, prior to Petitioner's birth, Mother intended to place Petitioner for adoption. Mother, a resident of Myrtle Beach, S.C., who was estranged from her own mother due to the out-of-wedlock pregnancy, was taken by a friend's mother to see a Columbia attorney where they discussed the adoption process. Thereafter, Mother moved to Columbia and, at the suggestion of the attorney and the friend's mother, resided with Claire Rayhorn.[1]

Mother testified she had no recollection of signing any documents concerning the adoption and none were produced at trial. Further, Claire paid her living expenses and either Claire or the attorney selected her obstetrician and the hospital for the birth.

In 1979, Hospital policies and procedures relating to adoption provided the mother was to execute a "Permit to Release Baby for Adoption"; the mother or her immediate family were allowed to see the infant at any time prior to discharge; the adoptive parents were not allowed to see the infant while the infant was in Hospital; the mother was allowed to view her infant through the nursery window or in her room if she requested; and Hospital's social services department was to be called if there were questions about adoption.

Petitioner alleged Hospital violated several of its policies and procedures. Mother and Hospital's director of Women's and Children's Services, testified no "Permit to Release Baby for Adoption" was executed by Mother. Mother testified Claire and a Hospital nurse told her she could not see or hold her baby after it was born. She was not permitted to see Petitioner because "the baby was being placed up for adoption" and she was not the adopting parent.

---

1. Claire is referred to in the record as Claire or Clara, with a last name of Rayhorn, Raymond, Manors, or Wilson. She did not testify at trial.

This resulted in a confrontation between Mother and Claire. However, Mother did not tell Hospital personnel she decided against the adoption. She never saw Petitioner before leaving Hospital.

Mother signed two forms entitled "Permission to Release Baby to Party Other Than Mother." The forms, contained in the medical charts of mother and infant, state:

I, the undersigned, mother of Baby Gardner, who was born in [Hospital] on November 16, 1979, hereby authorize and direct [Hospital] to release and deliver said baby to [Attorney] or his or her agents and I do hereby release and discharge [Hospital] from any claims on account of such release and delivery, and I do hereby indemnify and hold harmless the said hospital, its personnel, and my physician against any and all claims which may arise therefrom. It has been fully explained to me and I understand this does not in any way affect the permanent custody of my child and is given for the purpose of authorizing [Hospital] to permit the person named above to remove my child from the hospital as an accommodation to me.[2]

Mother, believing the adoption to be completed, made no attempt to recover her baby in the weeks or years following Petitioner's birth.

The putative adoptive parents, the Bergstroms, lived a nomadic lifestyle and Petitioner was taken into custody by Colorado authorities after an investigation revealed Ms. Bergstrom's boyfriend had taken nude photos of Petitioner at age 11.

In 1994, Colorado authorities determined Petitioner's birth certificate was forged and contacted Columbia, S.C., police. The birth certificate listed Linda Katherine Van Cleef as the mother and was signed by Linda K. Bergstrom. The investigation led police to Mother, who for the first time learned the whereabouts of Petitioner, who was then 14 years old. The investigation revealed the Columbia attorney delivered the baby to the Bergstroms at Hospital and was paid $2,000 as reimbursement for medical expenses. The adoption proceed-

---

2. The other form is identical, except much of the "hold harmless" language.

ing was not completed. Mother was granted custody of Petitioner in 1996.

This action commenced in 1998, alleging causes of action for negligence and intentional infliction of emotional distress. The circuit court denied Hospital's Rule 12(b)(6), SCRCP, motion to dismiss the negligence claim but granted Hospital's motion to dismiss the claim for intentional infliction of emotional distress. The circuit court further ruled the statutory limit on any recovery was $100,000.

The case was tried to a jury in 2000. The trial judge granted Hospital's motion for a directed verdict on the negligence claim. Petitioner appealed and the Court of Appeals affirmed, holding Hospital owed a legal duty of due care only to the Mother, not the infant. The Court of Appeals further held Petitioner could not satisfy the requirement she prove her damages were proximately caused by Hospital's alleged negligence. The Court of Appeals affirmed the dismissal of the cause of action for intentional infliction of emotional distress, and did not reach the damages limitation issue. *Bergstrom*, 352 S.C. at 228–233, 573 S.E.2d at 808–810.

It is not necessary to address the issues of duty or proximate cause in this case. Accordingly, we vacate the Court of Appeals' opinion addressing those matters and affirm the Court of Appeals in result.

## ISSUES

I. Did the circuit court err in ruling the statutory limit on any recovery by Petitioner was $100,000?

II. Did the Court of Appeals err in affirming the pretrial dismissal under Rule 12(b)(6), SCRCP, of Petitioner's cause of action for intentional infliction of emotional distress?

## STANDARD OF REVIEW[3]

■■ A trial court may properly grant a motion for summary judgment when "the pleadings, depositions, answers to

---

**3.** The record on appeal contains the circuit court's order, but does not contain Hospital's pretrial motions. The order mentions both Rule 12(b)(6) and Rule 56, SCRCP. We will review the first issue pursuant to the standard for Rule 56 motions. We will review the second issue

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), SCRCP. *See also Tupper v. Dorchester County*, 326 S.C. 318, 487 S.E.2d 187 (1997). In determining whether any triable issues of fact exist, the court must view the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the non-moving party. *Manning v. Quinn*, 294 S.C. 383, 365 S.E.2d 24 (1988). On appeal from an order granting summary judgment, the appellate court will review all ambiguities, conclusions, and inferences arising in and from the evidence in a light most favorable to appellant, the non-moving party below. *Williams v. Chesterfield Lumber Co.*, 267 S.C. 607, 230 S.E.2d 447 (1976).

Under Rule 12(b)(6), SCRCP, a defendant may move to dismiss a complaint based on a failure to state facts sufficient to constitute a cause of action. In considering such a motion, the trial court must base its ruling solely on allegations set forth in the complaint. If the facts and inferences drawn from the facts alleged in the complaint, viewed in the light most favorable to the plaintiff, would entitle the plaintiff to relief on any theory, then the grant of a motion to dismiss for failure to state a claim is improper. *Baird v. Charleston County*, 333 S.C. 519, 511 S.E.2d 69 (1999). In deciding whether the trial court properly granted the motion to dismiss, the appellate court must consider whether the complaint, viewed in the light most favorable to the plaintiff, states any valid claim for relief. *Gentry v. Yonce*, 337 S.C. 1, 522 S.E.2d 137 (1999). A motion to dismiss under Rule 12(b)(6) should not be granted if facts alleged and inferences reasonably deducible therefrom entitle the plaintiff to relief under any theory. *Id.* Further, the complaint should not be dismissed merely because the court doubts the plaintiff will prevail in the action. *Toussaint v. Ham*, 292 S.C. 415, 357 S.E.2d 8 (1987).

---

pursuant to the standard for Rule 12(b)(6) motions, as did the Court of Appeals.

## DISCUSSION

### I. Statutory limit on recovery

The circuit court ruled Petitioner's recovery was limited to $100,000 by the charitable immunity statute in effect in 1979, S.C.Code Ann. § 44–7–50 (1976). The Court of Appeals did not address this issue, given its affirmance of the dismissal of Petitioner's lawsuit on the grounds of no duty and no proximate cause. *Bergstrom*, 352 S.C. at 234, 573 S.E.2d at 811.

Petitioner contends the circuit court erred because, if § 44–7–50 was unconstitutional as declared in 1992 in *Hanvey v. Oconee Mem. Hosp.*, 308 S.C. 1, 416 S.E.2d 623, then it was unconstitutional in 1979. Therefore, there is no statutory cap on liability in this case.

Hospital asserts this case is controlled by *Laughridge v. Parkinson*, 304 S.C. 51, 403 S.E.2d 120 (1991), in which we held the decision in *Fitzer v. Greater Greenville YMCA*, 277 S.C. 1, 282 S.E.2d 230 (1981), abolishing charitable immunity would not be applied retroactively. *Laughridge* is not controlling because it does not address whether a statute later declared unconstitutional is deemed void *ab initio*.

In 1977, we abolished the doctrine of charitable immunity only as it pertained to hospitals, holding a hospital could be held liable for heedless or reckless acts. A hospital would not be liable for acts that were simply negligent. *Brown v. Anderson County Hosp. Ass'n*, 268 S.C. 479, 234 S.E.2d 873 (1977). Thereafter, the Legislature enacted § 44–7–50, which modified charitable immunity as it applied to hospitals by providing they could be held liable for tortious acts or omissions. Act No. 182 § 3, 1977 Acts 453; *Laughridge*, 304 S.C. at 54 n. 1, 403 S.E.2d 120 at n. 1. Petitioner was born in 1979 at Hospital when § 44–7–50 was in effect.

In 1981, we abolished the doctrine of charitable immunity in its entirety. *Fitzer, supra.* In 1984, the Legislature enacted S.C.Code Ann. §§ 33–55–200 to –230, which limited the liability of charitable organizations to $200,000, except for charitable hospitals from which recovery was still limited to $100,000 by § 44–7–50. Act No. 505, 1984 Acts 2144.

In 1986, we held that *Fitzer* had, by clear implication, overruled § 44–7–50, "render[ing] charities of all kinds subject

to suit to the same extent as all other persons, firms and corporations, allowing recovery of both actual and punitive damages." *Hasell v. Medical Society of South Carolina, Inc.,* 288 S.C. 318, 321, 342 S.E.2d 594, 595 (1986), *overruled on other grounds by Hanvey v. Oconee Mem. Hosp.,* 308 S.C. 1, 416 S.E.2d 623 (1992). Since the alleged malpractice in *Hasell* occurred after *Fitzer* totally abolished charitable immunity, the plaintiff's recovery in *Hasell* was no longer limited by § 44–7–50. However, we declined to address the constitutionality of § 44–7–50. *Hasell* is not dispositive in the present case because the alleged negligence occurred in 1979, two years before *Fitzer* was decided.

In 1992, we reached the question we had declined to address in *Hasell* and declared § 44–7–50 unconstitutional, ruling it violated the Equal Protection Clause because there was no rational basis for treating charitable hospitals different from other charitable organizations. We held the limit on recovery from a charitable hospital was $200,000 pursuant to § 33–55–210. *Hanvey v. Oconee Mem. Hosp.,* 308 S.C. 1, 416 S.E.2d 623 (explaining the somewhat convoluted development of the statutory and case law governing charitable immunity).[4]

█ "A cause of action accrues at the moment when the plaintiff has a legal right to sue on it. The law presumes at least nominal damages at that point. The fact that substantial damages did not occur until later is immaterial to determining when the action accrued or arose." *Stephens v. Draffin,* 327 S.C. 1, 5, 488 S.E.2d 307, 309 (1997) (tort claims of patient who had been treated for years by his physician, and claims of patient's wife, accrued before the date contributory negligence was abrogated; thus their claims were controlled by doctrine of contributory negligence as that rule was in effect when their claims first accrued) (citations omitted).

█ "In South Carolina, the law in effect at the time the cause of action accrued controls the parties' legal relationships and rights." *Id.; see also Tilley v. Pacesetter Corp.,* 355 S.C. 361, 371, 585 S.E.2d 292, 297 (2003) (plaintiffs' claims accrued

---

4. In 1994, the Legislature repealed § 33–55–210 and enacted S.C.Code Ann. § 33–56–180 (Supp.2003), which presently limits a plaintiff's recovery from a charitable organization to the same limits as contained in South Carolina Tort Claims Act.

prior to filing of class action lawsuit; therefore, version of consumer protection statute in effect when plaintiffs filed the lawsuit and court granted summary judgment was controlling); *Murphy v. Owens–Corning Fiberglas Corp.*, 356 S.C. 592, 590 S.E.2d 479, 482–484 (2003) (cause of action ordinarily accrues when facts relating to negligence and damages exist which authorize one party to maintain an action against another); *Swindler v. Swindler*, 355 S.C. 245, 247 n. 1, 584 S.E.2d 438, 439 n. 1 (Ct.App.2003) (applying provisions of Uniform Commercial Code in effect when cause of action accrued).

Petitioner's cause of action accrued in 1979 when Hospital allegedly failed to follow its adoption policies and Petitioner was discharged to an attorney, who in turn delivered her to a stranger. Facts relating to Hospital's negligence and Petitioner's damages existed in 1979, regardless of any future increase in alleged damages or the fact the statute of limitations was tolled until Petitioner reached the age of majority. *See* S.C.Code Ann. § 15–3–40 (Supp.2003) (minor tolling provision).

The more difficult question is whether our declaration in 1992 in *Hanvey, supra,* of the unconstitutionality of § 44–7–50 means the statute was unconstitutional from the date of its enactment in 1977. We have not often addressed the issue of the retroactivity of a declaration of the unconstitutionality of a statute. A review of our cases, as well as foreign cases, reveals that such a ruling generally means the statute is void *ab initio,* absent special circumstances. *See* cases collected in West's Digests, *Statutes,* Key Nos. 63 and 64.

Statutes are presumed to be constitutional and will not be found to violate the constitution unless their invalidity is proven beyond a reasonable doubt. *See, e.g., Knotts v. S.C. Dep't of Natural Resources,* 348 S.C. 1, 6, 558 S.E.2d 511, 513 (2002); *Feldman & Co. v. City Council of Charleston,* 23 S.C. 57, 66 (1885). When a statute is found unconstitutional, we have recognized the "general rule that an adjudication of [the] unconstitutionality of a statute ordinarily reaches back to the date of the act itself...." *Trustees of Wofford College v. Burnett,* 209 S.C. 92, 102, 39 S.E.2d 155, 159 (1946) (concluding tax abatements granted by state and local officials were voided by court's declaration that statute purporting to grant

property tax exemption to colleges for real estate not actually occupied by colleges was unconstitutional); *Herndon v. Moore*, 18 S.C. 339, 354 (1883) (recognizing general principle).

█ Generally, "when a statute is adjudged to be unconstitutional, it is as if it had never been. Rights cannot be built up under it; . . . it constitutes a protection to no one who has acted under it." *Atkinson v. Southern Express Co.*, 94 S.C. 444, 453, 78 S.E. 516, 519 (1913) (holding that portions of criminal statute which prohibited importation of alcoholic beverages into South Carolina from another state for personal use were unconstitutional when enacted as statute violated interstate commerce principles); *Feldman & Co. v. City Council of Charleston*, 23 S.C. 57 (1885) (issuance of $2 million in "fire loan" bonds under a city ordinance, which later was ratified by an act of Legislature, was for private purposes and thus violated constitutional requirement that taxes be levied only for public purposes; city's ordinance and Legislature's act were unconstitutional and void when enacted, which meant the bonds were not a valid debt of city and no action could be maintained to enforce their payment); *see also* 16A Am. Jur. 2d *Constitutional Law* §§ 203 to 206 (1998) (discussing general rule and its exceptions); 16 C.J.S. *Constitutional Law* § 108 (1984) (same).

However, we also have recognized the necessity of upholding the validity of transactions or events that occurred before a statute was declared unconstitutional. *See Knotts*, 348 S.C. at 11, 558 S.E.2d at 516 (while statute allowing members of legislative branch to oversee spending of funds was an unconstitutional violation of separation of powers and void in its entirety, executive branch agency would still be allowed to fulfill its proviso obligations under recent appropriations act); *O'Shields v. Caldwell*, 207 S.C. 194, 224, 35 S.E.2d 184, 196 (1945) (a public officer charged with disbursing funds usually is not liable for paying out public money when directed to do so by statute even when the statute later is found unconstitutional, unless officer acted fraudulently or in bad faith) (Oxner, J., dissenting in part)[5]; *Herndon*, 18 S.C. at 352–358 (apply-

---

5. The justices apparently agreed unanimously with this general principle, although it was stated in the dissent. The justices disagreed on

ing exceptional doctrine of *communis error facit jus*—"common error makes right"—to hold the great number of sales involving thousands of acres of property during ten-year period by probate courts were valid even though probate courts were later determined not to have subject matter jurisdiction to conduct such sales because statute purporting to grant such jurisdiction was unconstitutional).

Section 44–7–50, which we declared unconstitutional in 1992, was unconstitutional from the date of its enactment in 1977 and thus void *ab initio.* A close reading of the few South Carolina cases discussing the general rule indicates it is followed except in special or unusual circumstances, such as when doing so would create widespread havoc involving a great number of people or transactions, spawn unnecessary litigation, or result in flagrant injustice. *See Herndon, supra,* and *O'Shields, supra.* None of those situations is presented in the instant case.

Petitioner's cause of action accrued in 1979 and is governed by the law then in effect. Our conclusion § 44–7–50 was void *ab initio* means the controlling law in 1979 was *Brown,* 268 S.C. 479, 234 S.E.2d 873. Under that case, Petitioner is required to prove Hospital's acts were reckless, not simply negligent. Viewing the facts in the light most favorable to Petitioner as we must, we conclude, while Hospital arguably may have acted negligently in failing to follow certain policies, Hospital's acts as a matter of law do not rise to the required level of recklessness. Therefore, even if we assume without deciding that Hospital owed a duty to both Mother and Petitioner, and if we were to apply the maxim that proximate cause is an issue for the jury, Petitioner's cause of action nevertheless fails because she has not presented evidence Hospital acted recklessly. *See* Rule 220(c), SCACR (appellate court may affirm for any reason appearing in the record).

## II.   Dismissal of action for intentional infliction of emotional distress

The circuit court dismissed Petitioner's cause of action for intentional infliction of emotional distress, ruling

---

whether the county treasurer was entitled to a jury trial on the payment of funds to himself.

pursuant to Rule 12(b)(6), SCRCP, that Petitioner failed to state facts sufficient to constitute a cause of action. The Court of Appeals affirmed, but reasoned the facts as stated in the complaint failed to show the Hospital's conduct was the proximate cause of Petitioner's damages. *Bergstrom,* 352 S.C. at 233–234, 573 S.E.2d at 811.

To state a claim for intentional infliction of emotional distress, a plaintiff must show (1) the defendant intentionally or recklessly inflicted severe emotional distress, or was certain or substantially certain that such distress would result from his conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community; (3) the actions of defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it. *Ford v. Hutson,* 276 S.C. 157, 276 S.E.2d 776 (1981).

The facts relating to Hospital set forth in Petitioner's complaint are that Mother was admitted to Hospital for delivery, Hospital's nurse repeatedly refused to let her see Petitioner because she was not the adopting parent, and Hospital forced Mother to sign a form against her will authorizing an attorney to remove Petitioner from Hospital.

We conclude the circuit court erred in dismissing this action when the facts and inferences therefrom as set forth in the complaint are viewed in the light most favorable to Petitioner. If Hospital recklessly or intentionally made repeated and coercive efforts to separate a mother from her newborn infant, that might well constitute outrageous conduct that we would find utterly intolerable in a civilized community. Such conduct conceivably could cause severe emotional distress.

However, the evidence presented at trial revealed that, while Hospital's staff arguably may have acted negligently in failing to follow certain policies, the staff did not act recklessly or intentionally in the extreme or outrageous manner described in the complaint. Thus, it would have been proper for the trial judge to dismiss the action for intentional infliction of emotional distress on a directed verdict motion at the close of Petitioner's case. Accordingly, we affirm in result the ruling of the Court of Appeals on this issue. *See* Rule 220(c),

SCACR (appellate court may affirm for any reason appearing in the record).

## CONCLUSION

We conclude it is unnecessary to address the issues of duty or proximate cause in this case. Accordingly, we vacate those portions of the Court of Appeals' opinion. We conclude § 44–7–50 was void *ab initio* due to the 1992 decision finding it unconstitutional.

Absent that statute, the law in effect in 1979 when Petitioner's cause of action accrued requires Petitioner prove Hospital's actions were reckless, not merely negligent. Petitioner in her negligence action has not met the requisite burden of production of evidence, viewing the facts adduced at trial in the light most favorable to her. Petitioner's action for intentional infliction of emotional distress fails for similar reasons; consequently, we affirm in result the dismissal of this action

**VACATED IN PART; AFFIRMED IN PART.**

TOAL, C.J., MOORE, WALLER, JJ., and Acting Justice JAMES E. BROGDON, JR., concur.